2003 VT 5

## Natalie Wetmore Colwell v. Allstate Insurance Company
## Nicholas Bonanno v. Bell Atlantic Communications, Inc. and
## American Protection Insurance Co.

[819 A.2d 727]

Nos. 00-053 & 00-410

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed January 31, 2003

*John J. Welch, Jr.*, Rutland, for Plaintiff-Appellant Colwell.

*Geoffrey W. Crawford* of *O'Neill Crawford & Green*, Burlington, for Plaintiff-Appellant Bonanno.

*Michael H. Lipson*, Of Counsel, of *Affolter, Gannon & Flynn, Ltd.*, Burlington, for Defendant-Appellee Allstate Insurance Company.

*Potter Stewart, Jr.* and *Kirsten A. Beske* of *Potter Stewart, Jr. Law Offices*, Brattleboro, for Defendant-Appellee Bell Atlantic Communications, Inc.

*James W. Coffrin* and *Robin A. Ober* of *Pierson, Wadhams, Quinn & Yates*, Burlington, for Defendant-Appellee American Protection Insurance Co.

*Robert A. Mello* and *John H. Klesch* of *Law Office of Robert A. Mello*, South Burlington, for Amicus Curiae National Association of Independent Insurers.

*Geoffrey W. Crawford* of *O'Neill Crawford & Green*, Burlington, and *David Yarnell* of *Kissane, Yarnell & Cronin*, St. Albans, for Amicus Curiae Vermont Trial Lawyers Ass'n.

¶ 1. **Johnson, J.** The common issue presented by these two consolidated appeals is whether a tortfeasor-motorist is underinsured

within the meaning of 23 V.S.A. § 941(f) where the tortfeasor's liability policy limits are greater than the injured party's underinsurance limits, but are insufficient to satisfy the injured party's damages because of payments made to other victims of the same accident. The *Bonanno* case also asks us to decide whether a self-insured employer must provide underinsurance motorists (UIM) benefits to its employees, and if so, whether the workers' compensation exclusivity statute bars payment of those benefits to the injured worker.

¶ 2.   Regarding the first issue, we conclude that the plain language of 23 V.S.A. § 941(f) entitles an injured party to UIM coverage only when the liability limits of the tortfeasor's insurance policy are less than the injured party's uninsured/underinsured (UM/UIM) limits. In the *Bonanno* case, we conclude that self insurers must provide UIM coverage, and that 21 V.S.A. § 622, the exclusivity provision of Vermont's workers' compensation statute, does not bar the employee from seeking UIM benefits from his self-insured employer.

## I. *Facts and Procedural History*

### A. *The Colwell Case*

¶ 3.   On December 18, 1995, plaintiff Natalie Wetmore Colwell was injured in an automobile accident involving several other vehicles, and incurred damages in excess of $50,000. At the time of the accident, Colwell was covered under an automobile insurance policy defendant Allstate Insurance Company issued. The policy provided $50,000 in single-limit UM/UIM coverage. The driver who allegedly caused the accident also had a single-limit liability policy with $50,000 in coverage, but that coverage was not enough to pay all claims arising out of the multiple vehicle accident. Consequently, Colwell settled her claim against the tortfeasor for $34,473 and looked to the UIM coverage in her Allstate policy for further compensation. Allstate denied her claim, asserting that because the tortfeasor's liability policy limit was not less than Colwell's UM/UIM limit, the tortfeasor was not underinsured within the meaning of her Allstate policy or § 941(f). In response, Colwell sought a declaratory judgment that she is entitled to UIM coverage. By joint request of the parties, the superior court certified to this Court pursuant to V.R.A.P. 5(a) the question of whether Colwell was entitled to UIM coverage under the circumstances of this case.

### B. *The Bonanno Case*

¶ 4.   On December 22, 1995, plaintiff Nicholas Bonanno was operating his employer's vehicle during a work-related activity when he

was injured in an automobile accident. His employer, defendant Bell Atlantic Communications, Inc., was self insured. The driver of the vehicle who caused the accident was covered by a $500,000 liability policy. Bonanno collected workers' compensation benefits from Bell Atlantic. He also obtained a recovery under the tortfeasor's policy, but only in the amount of $62,500 because of payments made to another person rendered quadriplegic by the accident.

¶ 5. Claiming that he had not been fully compensated for his injuries, Bonanno sought UIM coverage from Bell Atlantic and from defendant American Protection Insurance Co. (API), with whom he had a personal automobile insurance policy providing $300,000 in UM/UIM coverage. Both Bell Atlantic and API denied coverage, and Bonanno filed the present action for declaratory relief. The superior court granted summary judgment in favor of Bell Atlantic and API, ruling that Bonanno's workers' compensation recovery was his exclusive remedy from his employer, and that UIM coverage was not available under his API policy because the tortfeasor was not underinsured as defined by § 941(f).

## II. *UIM Coverage*

¶ 6. We first address the issue common to both cases: whether § 941(f) defines "underinsured" by comparing policy limits only without any consideration of the funds actually available from the tortfeasor's policy to pay all claims arising out of an accident. Because appellants in both cases concede that the relevant provisions of their individual policies are consistent with the terms of the governing statute, 23 V.S.A. § 941(f), we examine the statute directly to resolve the issue.

¶ 7. In construing a statutory provision, our paramount goal is to discern and implement the intent of the Legislature. *Baker v. State*, 170 Vt. 194, 198, 744 A.2d 864, 868 (1999); *State v. O'Neill*, 165 Vt. 270, 275, 682 A.2d 943, 946 (1996). When the language of a statute is plain and unambiguous, we presume that the Legislature intended the meaning expressed by that language. *Baker*, 170 Vt. at 199, 744 A.2d at 868. In such situations, our duty is to enforce the statute according to its terms without resort to statutory construction. *Tarrant v. Dep't of Taxes*, 169 Vt. 189, 197, 733 A.2d 733, 739 (1999); *Sanders v. St. Paul Mercury Ins. Co.*, 148 Vt. 496, 504, 536 A.2d 914, 918 (1987). We have such a situation here.

¶ 8. Section 941(f) defines an underinsured motor vehicle as follows:

> For the purpose of this subchapter, a motor vehicle is underinsured to the extent that its personal injury limits of

liability at the time of an accident are less than the limits of uninsured motorists coverage applicable to any injured party legally entitled to recover damages under said uninsured motorist coverage.

We have repeatedly interpreted the statute as requiring a comparison of policy limits as they exist at the time of the accident in accordance with § 941(f)'s unambiguous plain language. See, e.g., *Merkel v. Nationwide Ins. Co.*, 166 Vt. 311, 315, 693 A.2d 706, 708 (1997); *Webb v. United States Fid. & Guar. Co.*, 158 Vt. 137, 141, 605 A.2d 1344, 1347 (1992); *Stanhope v. Lumbermens Mut. Ins. Co.*, 155 Vt. 645, 646, 582 A.2d 150, 150 (1990) (mem.). The statutory provision makes no mention of comparing UM/UIM coverage to the amounts actually available or paid to the injured insured(s) at some later point under the tortfeasor's policy.

¶ 9. Appellants argue nevertheless that we must ignore the literal terms of § 941(f) because the terms create anomalous and unfair results that are contrary to the statute's objectives. See *In re Jewell*, 169 Vt. 604, 606, 737 A.2d 897, 900 (1999) (mem.) (statute should not be construed in way that is at odds with its underlying purpose); *Braun v. Bd. of Dental Examiners*, 167 Vt. 110, 117, 702 A.2d 124, 128 (1997) (Legislature is presumed not to have intended interpretation that would lead to absurd or irrational results). According to appellants, adhering to the plain language of the statute means they would have been better off if their tortfeasors had no insurance, an anomalous result they assert the Legislature intended to resolve by enacting the UIM provision in 1980. See *Merkel*, 166 Vt. at 314, 693 A.2d at 708; *Monteith v. Jefferson Ins. Co. of N.Y.*, 159 Vt. 378, 386, 618 A.2d 488, 492 (1992). We find this argument appealing, but ultimately unpersuasive for the reasons that follow.

¶ 10. The legislative history of § 941(f) shows that while the Legislature may have chosen the current language of the statute as the way to fix the anomaly that an injured motorist was better off if the tortfeasor was uninsured than if he carried some insurance, it did not appreciate how the statute would operate in accidents involving multiple victims. When introduced to the Vermont House of Representatives in 1979, UIM coverage was a new concept. As a result, much of the testimony in the early committee hearings on the matter was explanatory in nature and filled with confusion. Through the confusion emerged a consensus that the underinsurance provision should protect individuals involved in accidents with "marginally insured" motorists, just as the financial responsibility law protects people involved in accidents with uninsured motorists. Statement of Stewart Ledbetter on

H.411 to Senate Highways and Traffic Committee, at 21 (Mar. 21, 1979); Testimony of Linda Reis on H.411 to Senate Finance Committee, at 11-12 (Mar. 25, 1980). Unfortunately, very few details about how the statute would function beyond that broad policy goal, including how the statute might operate in multiple-victim accidents, arose from the debate. The Legislature finally settled on the present language, which offers some protection against accidents with marginally insured motorists. But in some multiple-victim accidents, as Colwell and Bonanno's cases show, more compensation is available to satisfy an injured motorist's damages when the tortfeasor has no insurance at all. Section 941(f) therefore does not fully address the discrepancy between uninsured motorists and marginally insured motorists the Legislature sought to fix by enacting the statute.

¶ 11. Although the statute does not solve the entire problem of coverage against underinsured motorists, § 941(f) does not fail in its essential purpose because it offers some protection against marginally insured motorists. Legislators apparently did not contemplate the statute's operation in multiple-victim accidents because the issue never came up during the relevant legislative hearings. Thus, we cannot be certain what the Legislature would have done if it had been aware of the multiple-victim problem, and we must therefore enforce the statute's plain language.

¶ 12. Nor does interpreting the statute according to its plain language reach the absurd result that appellants suggest. Indeed, some states have made the very same language choice that Vermont did, but with awareness of what the effect would be in some multiple-victim scenarios. As in Vermont, mandated UIM coverage became the law in states across the country because of the perceived inadequacies and inequities of UM coverage. The states faced complex policy decisions in determining the extent to which they wanted to require insurers to provide UIM coverage. Two general views of UIM coverage developed. The first, often called "excess coverage," deems a tortfeasor underinsured when the injured party's damages exceed the tortfeasor's liability coverage. See, e.g., *Kothrade v. Am. Family Mut. Ins. Co.*, 462 N.W.2d 413, 415 (Minn. Ct. App. 1990) (construing Minn. Stat. § 65B.43, subd. 17, which defines underinsured motor vehicle as having liability policy that "is less than the amount needed to compensate the insured for actual damages"); see 3 A. Widiss, Uninsured and Underinsured Motorist Insurance § 35.2, at 206-10 (rev. 2d ed. 2001) (citing statutes in which UIM coverage is determined by comparing limits of tortfeasor's liability insurance to claimant's damages). States requiring insurers to

provide this broader type of coverage intended to indemnify injured insureds for all of their damages not compensated by the tortfeasor's coverage. See *State Farm Mut. Auto. Ins. Co. v. Messinger*, 283 Cal. Rptr. 493, 500 (Ct. App. 1991).

¶ 13.  A variant of "excess coverage" statutes requires insurers to provide UIM coverage to the extent that the amount actually available to the injured party from the tortfeasor's policy was less than the UIM coverage limits stated in the injured party's policy. See, e.g., *Florestal v. Gov't Employees Ins. Co.*, 673 A.2d 474, 478-79 (Conn. 1996) (comparing Conn. Gen. Stat. § 38a-336 with § 38a-336a); see also *Colonial Ins. Co. v. Tumbleson*, 873 F. Supp. 310, 313 (D. Alaska 1995) (construing Alaska Stat. § 28.20.445(h)); *Leetz v. Amica Mut. Ins. Co.*, 839 P.2d 511, 513 (Colo. Ct. App. 1992) (construing Colo. Rev. Stat. § 10-4-609(4)); *Motorists Mut. Ins. Co. v. Andrews*, 604 N.E.2d 142, 144-46 (Ohio 1992) (construing Ohio Rev. Code Ann. § 3937.18(A)(2)).

¶ 14.  On the other hand, many states, including Vermont, required insurers to provide more narrow "gap coverage" intended only to place the insured in the same position as if, at the time of the accident, the tortfeasor had liability coverage equal to the insured's UIM coverage. *Messinger*, 283 Cal. Rptr. at 501; see, e.g., *Allstate Ins. Co. v. Gillaspie*, 668 A.2d 757, 759 (Del. Super. Ct. 1995) (construing Del. Code Ann. tit. 18, § 3902(b)(2), which defines underinsured motor vehicle as having liability coverage less than claimant's UM/UIM coverage); *Alguila v. Safety Ins. Co.*, 624 N.E.2d 79, 81 (Mass. 1993) (construing Mass. Gen. Laws ch. 175, § 113L(2), which defines underinsured motor vehicle as having liability coverage less than insured's UIM coverage); see 3 A. Widiss, *supra*, § 35.2, at 193-200 (contrasting statutes, including § 941(f), that compare tortfeasor's liability policy limit with insured's UIM policy limit to statutes that compare insured's UIM policy limit with amount of tortfeasor's liability insurance actually available to injured insured). This type of scheme requires UIM coverage only if the tortfeasor's stated liability limits are less than the insured's UIM coverage at the time of the accident. *Messinger*, 283 Cal. Rptr. at 501.

¶ 15.  While we recognize that § 941(f) does not fully address the problem of UIM benefits in multiple-victim accidents, in view of the number of choices available to solve the problem of underinsured motorists generally, this is an inappropriate case for the Court to fashion the particular remedy Colwell and Bonanno seek, even if we agreed that one was warranted. Whether § 941(f)'s language should reflect the "excess coverage" policy other states have adopted, as Colwell and Bonanno essentially argue, or remain a "gap coverage"

provision, is not a decision for this Court to make. The Legislature must determine whether a problem in this area exists, and if so, what is the best way to solve it.

¶ 16. Appellants also claim that construing § 941(f) in a manner that prevents them from recovering the difference between the money actually available from the tortfeasor and the stated amount of their UIM coverage denies them the benefits of the coverage for which they paid. We do not agree. Appellants concede that their insurance policies are consistent with the mandates of the financial responsibility law. See *Sanders*, 148 Vt. at 507-08, 536 A.2d at 921 (insurance policy meets consumer's expectations if policy complies with statutory requirements in every respect). Moreover, the fact that they paid premiums for a certain level of UIM coverage does not mean that they failed to obtain the benefit of their bargain simply because they were not compensated to the level of the UIM coverage stated in their policies. "[T]he benefit that the policyholder receives from UM/UIM coverage is protection against the probability of deficient recovery from the tortfeasor, *not guaranteed receipt of payment equal to the UM/UIM coverage.*" *Travelers Cos. v. Liberty Mut. Ins. Co.*, 164 Vt. 368, 375, 670 A.2d 827, 831 (1995) (emphasis added).

¶ 17. In sum, we hold that the plain language of § 941(f) controls the definition of "underinsured." We therefore answer the certified question in Colwell's case in the negative. In Bonanno's case, we affirm the superior court's judgment denying Bonanno's claim against his insurer API because his UIM policy limits do not exceed the liability limits of the tortfeasor's policy.

### III. *Workers' Compensation, Self Insurance and UIM*

¶ 18. Bonanno's case has a second issue, however. Bonanno's injury occurred during the course of his employment with Bell Atlantic. When Bonanno sought UIM payments from Bell Atlantic as a self insurer, the company denied any liability for UIM benefits, first claiming that its UIM coverage extended only to the statutory amounts in effect at the time of the accident ($20,000 for one person and $40,000 for two or more people injured or killed) and therefore Bonanno was not underinsured. The company later claimed that its self-insurance plan in Vermont did not include UIM benefits because as a self insurer it was not required to offer such benefits under the law. In any event, Bell Atlantic claimed the exclusivity provision of Vermont's Workers' Compensation Act, 21 V.S.A. § 622, barred any further recovery for Bonanno from the company.

¶ 19.  Three factors ground our decision that Bonanno's claim against Bell Atlantic is not precluded by the exclusivity of the Workers' Compensation Act. First, the Legislature intended self insurance to operate on an equal footing with traditional liability insurance. Second, requiring Bell Atlantic to provide UIM benefits to injured workers is not inconsistent with the purpose of the Workers' Compensation Act and our precedents interpreting it. Third, the Legislature's intent to create universal UIM coverage should not be defeated by an employer's choice to self insure. Accordingly, we hold that self-insured employers have the same obligation as commercially insured employers to furnish UIM benefits to workers injured on the job by underinsured motorists.

## A. *Self Insurance and UIM*

¶ 20.  We begin by addressing whether § 941(f)'s mandate for UIM coverage extends to self insurers. Because § 941(f) (UIM) and 23 V.S.A. § 801(c) (self insurance) are parts of Vermont's motor vehicle financial responsibility system, they must be considered together to discern the Legislature's intent regarding mandatory UIM coverage. *Bd. of Trustees of Kellogg-Hubbard Library, Inc. v. Labor Relations Bd.*, 162 Vt. 571, 574, 649 A.2d 784, 786 (1994) (statutes that are closely related because they deal with the same subject matter or have a similar purpose must be construed with reference to each other).

¶ 21.  Vermont's financial responsibility law requires all drivers and owners of automobiles in the state to maintain some form of insurance for liability claims arising from motor vehicle accidents. 23 V.S.A. § 800(a); see also *id.* § 809 (waiver of proof of financial responsibility "shall not be construed to relieve an operator of his or her responsibility to comply with the mandatory insurance requirement set forth in 23 V.S.A. § 800"). The statute prescribes either an insurance policy, surety bond, or "in lieu thereof," evidence of self insurance. 23 V.S.A. § 800(a). Section 801 authorizes three methods to prove compliance with § 800(a)'s mandatory insurance requirement: (1) a policy of insurance, (2) a surety bond, or (3) a certificate of self insurance. *Id.* § 801(a), (c). Self insurance, authorized by § 801(c), did not exist at the time of the original provision's adoption in 1927. See 1927, No. 81, § 2. The Legislature authorized self insurance in a 1955 amendment to the statute. See 1955, No. 124, § 1. Except as to amount, the language of § 801(c) remains identical to the 1955 amendment, which allows self insurance "in lieu of" an insurance policy or bond. 23 V.S.A. § 801(c). "In lieu of" means "instead." See Webster's New International Dictionary 1427 (2d unabr. ed. 1961). "Instead" means "equivalent" or "as a

substitute." See *id.* at 1287. Thus, the Legislature's amendment in 1955 was intended to equate self insurance with a policy of insurance or surety bond. See also 23 V.S.A. § 800(a) (allowing self insurance "in lieu of" mandatory liability policy or surety bond).

¶ 22. Bell Atlantic argues that the language of § 801(c) limits a self insurer to liability coverage only and does not contemplate UIM coverage. It is true that a self insurer's responsibility under the plain language of § 801(c) is to obtain a certificate of self insurance protecting the driver of the self-insured vehicle against claims where the driver is the tortfeasor. See *Champlain Cas. Co. v. Agency Rent-A-Car, Inc.*, 168 Vt. 91, 97, 716 A.2d 810, 814 (1998) (§ 801(c) "provides a relationship between the self-insurer and the tortfeasor and describes it as insurance against the tortfeasor's loss"). The pertinent question is not what § 801(c) says alone, however, but whether the Legislature intended § 941(f) to require those who choose to self insure to provide UIM coverage. The answer, we conclude, is unequivocally yes.

¶ 23. Thirteen years after the Legislature adopted self insurance as the third method of proving financial responsibility, it addressed the problem of uninsured motorists by enacting what is now § 941(f). 1967, No. 374 (Adj. Sess.), § 1. Like the present version, Act No. 374 provided that "[n]o policy insuring against liability arising out" of the use, ownership, or maintenance of an automobile may be issued or delivered in Vermont without an uninsured motorist provision. *Id.* As explained above, the Legislature added the underinsurance provision in 1980. Bell Atlantic asks this Court to construe the statute to exclude self insurers because § 941(f) refers to a "policy" of insurance and self insurers do not issue "policies." To conclude Bell Atlantic's interpretation of § 941(f) is the correct one, we would have to agree that the Legislature intended § 941(f) to *exclude* from its protection *all* motorists insured through self-insurance plans or surety bonds. That construction of § 941(f) is incompatible with the Legislature's intent to equate self insurance with a commercial insurance policy. Cf. *Wright v. Smallwood*, 419 S.E.2d 219, 220-21 (S.C. 1992) (legislative mandate that all automobile insurance "policies" provide uninsurance coverage requires self insurers to provide uninsurance coverage because self insurance is a substitute for an insurance policy). Moreover, it frustrates the broad remedial purpose underlying the UM/UIM requirement. See *Monteith*, 159 Vt. at 382, 618 A.2d at 490. Self insurance should not be a way to avoid claims of those persons the Legislature intended to protect through the motor vehicle financial responsibility laws. *Nat'l Farmers Union Prop. & Cas. Co. v. Bang*, 516 N.W.2d 313, 317 (S.D. 1994). Bell Atlantic has not

offered any rationale for making the distinction between commercial insurers and self insurers that it suggests here, and we cannot discern one from the statutory language. Consequently, we conclude that § 941(f) directs mandatory UM/UIM coverage in all forms of motor vehicle insurance, including self insurance, so that all motorists have minimum protection from financially irresponsible drivers.

¶ 24. Interpreting § 941(f) to require UIM coverage for all insured motor vehicles regardless of the form of insurance is consistent with decisions in other states.[1] Construing a statute equating self insurance with a commercial insurance policy, the South Dakota Supreme Court held that self insurers must provide UIM coverage, which the South Dakota legislature required in all motor vehicle insurance policies. *Id.* In a decision relating to UM coverage, the New Jersey Supreme Court determined that the legislative requirement to carry uninsured motorist coverage applied to self insurers. *Christy v. City of Newark*, 510 A.2d 22, 27 (N.J. 1986). It explained: "So strong is the public policy favoring UM coverage that in the absence of an unmistakable legislative declaration to the contrary, we are certain that the foregoing principle applies to any legislatively-authorized self-insurance fund . . . ." *Id.* at 27-28. In *Hartford Insurance Co. v. Hertz Corp.*, 572 N.E.2d 1 (Mass. 1991), the Massachusetts Supreme Judicial Court held self insurers must provide UIM coverage. It reasoned that the broad remedial purpose of UIM "would not be served if an automobile owner could avoid maintaining underinsured motorist coverage by becoming self-insured under a motor vehicle liability bond."[2] 572 N.E.2d at 5; see also *Heavens v. Laclede Gas Co.*, 755 S.W.2d 331, 332-33 (Mo. Ct. App. 1988) (self insurers must provide UM; holding otherwise would allow self insurers to circumvent statutory mandate for UM coverage). We therefore hold that self insurers must provide UIM coverage like other insurers.

---

[1] We recognize that contrary authority exists, but we do not find that authority persuasive. See, e.g., *City of Gary v. Allstate Ins. Co.*, 612 N.E.2d 115, 118-19 (Ind. 1993) (discussing conflicting authority and holding that self-insured city does not have to provide UIM coverage).

[2] The Massachusetts Supreme Judicial Court held in *Berger v. H.P. Hood, Inc.*, 624 N.E.2d 947, 949-50 (Mass. 1993), however, that the workers' compensation exclusivity provision in Massachusetts precludes injured workers from receiving UIM benefits from both the employer and the employer's automobile insurer.

## B. *UIM and Workers' Compensation Exclusivity*

¶ 25.   We now address Bell Atlantic's argument that the exclusivity provision of Vermont's Workers' Compensation Act, 21 V.S.A. § 622, bars any recovery for UIM benefits from a self-insured employer. The issue central to this question is whether Bell Atlantic can be considered a "third party" subject to UIM liability to Bonanno under § 624(a) of the Act. Bell Atlantic asserts that it is not a "third party" because it is Bonanno's employer. In making this argument, Bell Atlantic ignores this Court's precedent looking favorably on the so-called "dual persona" or "dual capacity" doctrine. Under that doctrine, an employer immune from suit by § 622 may be subject to a third-party claim in accordance with § 624(a) if the employer's liability to the victim arises from actions taken in a nonemployer capacity.

¶ 26.   In *Derosia v. Duro Metal Products Co.*, 147 Vt. 410, 413, 519 A.2d 601, 604 (1986), we held that a workers' compensation insurer, which is considered the "employer" under the Workers' Compensation Act, 21 V.S.A. § 601(3), is a third party subject to suit if the insurer "undertakes to provide, rather than pay for, benefits and services." 147 Vt. at 413, 519 A.2d at 604. Similarly, we have found no bar to suits against corporate officers who otherwise enjoy employer immunity under § 622 where the officer's negligence arose from a breach of a personal duty rather than a duty owed to the worker by the employer. See, e.g., *Gerrish v. Savard*, 169 Vt. 468, 471-72, 739 A.2d 1195, 1198 (1999) (third-party exception to exclusivity may in certain circumstances apply to an employer if employer acts in capacity of co-employee in negligently causing accident); *Garrity v. Manning*, 164 Vt. 507, 511, 671 A.2d 808, 811 (1996) (adopting the Wisconsin rule on dual capacity, which requires examination of the duty breached when assessing whether worker's suit for damages is permissible); see also *Dunham v. Chase*, 165 Vt. 543, 543, 674 A.2d 1279, 1280 (1996) (mem.) (corporate officer may be subject to co-employee liability for those negligent acts that breach personal duty only rather than nondelegable corporate duty).

¶ 27.   Our decision in *Libercent v. Aldrich*, 149 Vt. 76, 539 A.2d 981 (1987), further supports Bonanno's claim against Bell Atlantic. In deciding that § 624(a) allowed a third-party claim by a state employee against a coworker where the state would defend and indemnify the coworker, we looked at the source of the state's obligation to defend its employees in the workplace negligence suit and determined that it arose independently of its obligations under the Workers' Compensation Act. 149 Vt. at 82-83, 539 A.2d at 985. We explained that the state "does not

assume direct liability for the acts of an employee; rather its status is analogous to that of an insurer." *Id.* at 82, 539 A.2d at 985. The same analogy applies in this case, even if the employer is a named defendant. Bell Atlantic's liability for UIM is not direct; rather, Bell Atlantic's liability arises from the negligence of the third-party underinsured driver who caused Bonanno's injuries and the statutory mandate to provide UIM coverage. Bell Atlantic's role in this case, like that of the state in *Libercent,* is one of an insurer. Like the co-employee tortfeasor in *Libercent,* the tortfeasor who injured Bonanno remains primarily liable, although the damages Bonanno seeks to recover will come in whole or in part from the employer as UIM insurer. Cf. *William v. City of Newport News,* 397 S.E.2d 813, 816 (Va. 1990) (employer's liability for UIM payments to injured worker flows from judgment obtained against third-party tortfeasor and statute requiring self insurers to provide UIM coverage; the workers' compensation exclusivity provision therefore does not apply); see also *Nat'l Farmers Union,* 516 N.W.2d at 318 (if employee seeks UIM from employer for injury employer caused, claim is barred by workers' compensation exclusivity, but claim is not barred where third party causes injury).

¶ 28.   Thus, under our precedents, we examine the capacity in which the party protected by § 622 was engaged to determine the injured worker's right to pursue additional compensation under § 624(a). Section 622 immunity offers no protection to an insurer or corporate officer who becomes liable to an injured employee for actions taken outside of the employer/employee relationship. The same rule should apply here to Bell Atlantic. Bell Atlantic has chosen a dual role for itself. It is an employer. The company is also an insurer bound to provide UIM coverage on its motor vehicles in accordance with § 941(f). Invoking the dual capacity doctrine here recognizes Bell Atlantic's different and distinct duties toward Bonanno: its duty as an employer to provide workers' compensation, and its duty as an insurer and automobile owner to maintain UIM coverage on its vehicles.

¶ 29.   Applying the dual capacity doctrine in this case also makes sense because it furthers the Legislature's intent regarding UIM and self insurance and does no violence to the concepts underlying workers' compensation. The purpose of the Workers' Compensation Act is to eliminate the delays and costs involved in employee/employer litigation over workplace injuries under the common law. See *Sienkiewycz v. Dressell,* 151 Vt. 421, 423, 561 A.2d 415, 416 (1989) (workers' compensation law was passed for benefit of employees who were victims of industrial injury to avoid cost, delays, and complications of recovery

under old common law, with its rules relating to such doctrines as contributory negligence and fellow servant negligence). The Act provides swift compensation to the injured worker in exchange for employer immunity from suit for the worker's injury. *Id.* Underlying § 941(f) is the legislative desire to protect the insured public from financially irresponsible drivers, *Monteith,* 159 Vt. at 381, 618 A.2d at 489-90, by requiring *all* owners or operators of motor vehicles to obtain UIM coverage regardless of the form of insurance. Employer responsibility for an employee's workplace injury is not at issue when the employee seeks UIM benefits from any UIM provider. When the employee seeks UIM payments from the employer, the employee is enforcing the employer's statutory obligation to provide UIM coverage irrespective of the method of insurance. The facial conflict between mandatory UIM coverage, the exclusiveness of the workers' compensation remedy, and the third-party exception to exclusivity can be resolved by harmonizing the statutes to give effect to the legislative intent underlying each. See *Vt. Agency of Natural Res. v. Holland,* 159 Vt. 21, 23, 613 A.2d 712, 713 (1992) ("Where two statutory provisions conflict, interpretations that harmonize and give effect to both are favored."). Bell Atlantic's position, on the other hand, frustrates the Legislature's intent to make UIM coverage universal, even for workers injured by underinsured motorists, solely because Bell Atlantic made a business decision to self insure. See *Heavens,* 755 S.W.2d at 333 ("[I]t would be . . . unconscionable to allow an employer to totally avoid providing employees with uninsured motorist coverage by choosing to be self-insured."). It is inconceivable that this result was intended by the Legislature when it enacted § 941(f), which was intended to apply to drivers generally. Therefore, the trial court's decision in Bell Atlantic's favor must be reversed.

## C. *Bell Atlantic's UIM Coverage*

¶ 30. The remaining issue is the extent of Bell Atlantic's UIM coverage. Under today's decision if Bell Atlantic's UIM coverage is equal to or less than the tortfeasor's liability coverage of $500,000, Bonanno has recovered all he can from the company for the accident. As one might expect, the parties disagree about the extent of Bell Atlantic's UIM obligation; Bell Atlantic at one time claimed it provided UIM coverage only at the statutory amount, and Bonanno claims the company has no UIM limits because its self insurance coverage is unlimited and the company cannot prove it rejected the higher limits.

¶ 31. Resolution of this dispute requires a factual inquiry into the limits of Bell Atlantic's self-insurance plan because "self insurance" is a term with no specific legal meaning. 1 L. Russ & T. Segalla, Couch on Insurance 3d § 10-1, at 10-2 (1997). Most often, the term encompasses situations where a large corporation, governmental entity, or charitable organization chooses to forego purchase of a commercial insurance policy in favor of managing its potential risks through the establishment of a reserve fund or purchase of a bond. *Id.*; see also 1 E. Holmes & M. Rhodes, Holmes's Appleman on Insurance 2d § 2.18, at 326 (1996). In some cases, the self-insured entity purchases a commercial insurance policy with a high deductible so that it meets losses up to that deductible through the entity's own assets. 1 L. Russ & T. Segalla, *supra*, at 10-3; 1 E. Holmes & M. Rhodes, *supra*, at 326; M. Flory & A. Walsh, *Know Thy Self-Insurance (And Thy Primary and Excess Insurance)*, 36 Tort & Ins. L.J. 1005, 1007 (2001); see, e.g., *McClain v. Begley*, 465 N.W.2d 680, 681 (Minn. 1991) (company's self-insurance plan entailed a self-insurance reserve of $500,000 before excess insurance policy provided by commercial insurer for an additional $2,500,000 was triggered).

¶ 32. In this case, the record shows that Bell Atlantic purchased an excess liability policy with coverage for its automobiles. In 1999, the policy had a self-insurance retention of $2,000,000, which meant that the company was self insured up to $2,000,000 before the commercial policy was triggered. It is unclear from the record whether the self-insurance retention amount at the time of Bonanno's accident was also $2,000,000, or some other amount. With respect to coverage for UIM, the record also contains conflicting evidence. Deposition testimony from company officials indicated that under Bell Atlantic's self-insurance plan, the company would pay UIM benefits, but only up to the amounts required by statute. Later supplemental interrogatory responses indicated that the company's self-insurance plan in Vermont did not include benefits for UIM because company attorneys advised that Vermont did not require self insurers to provide UIM coverage. Bonanno claims that Bell Atlantic cannot prove that it selected the statutory limits for UIM, rather than providing coverage equal to its general liability limits. See *Lecours v. Nationwide Mut. Ins. Co.*, 163 Vt. 157, 159, 657 A.2d 177, 179 (1995) (although insurer has burden to prove the insured rejected higher UM limits, the rejection need not be in writing).

¶ 33. The trial court did not determine the extent of Bell Atlantic's liability, if any, because it granted the company summary judgment on the applicability of the workers' compensation exclusivity bar. Like the

trial court, we review the record to determine if a genuine dispute over material facts exists and any party is entitled to judgment as a matter of law. See V.R.C.P. 56(c)(3) (summary judgment proper when no genuine material facts are in dispute and any party is entitled to judgment as a matter of law); *Mellin v. Flood Brook Union Sch. Dist.*, 173 Vt. 202, 211, 790 A.2d 408, 417 (2001) (Court uses same summary judgment standard on appeal as trial court used below). It is apparent from the conflicting factual record before us now that summary judgment on Bell Atlantic's self-insurance limits is not appropriate. We therefore remand the matter back to the trial court for final determination.

*In Supreme Court Docket No. 2000-053, we answer the certified question in the negative. In Supreme Court Docket No. 2000-410, we affirm the court's judgment for appellee American Protection Insurance, and we reverse the judgment in favor of appellee Bell Atlantic Communications, Inc. and remand for further proceedings consistent with this opinion.*