STATE OF VERMONT

| SUPERIOR COURT | ENVIRONMENTAL DIVISION |
| Vermont Unit | Docket No. 21-2-13 Vtec |

| | |
|---|---|
| WhistlePig, LLC Act 250 JO (#9-070) | DECISION ON MOTION |

### Decision on Motions for Summary Judgment

WhistlePig, LLC and its principal Raj Bhakta (together "WhistlePig") appeal the February 8, 2013 Act 250 Jurisdictional Opinion #9-070 ("the JO") in which the District 9 Environmental Commission Coordinator ("District Coordinator") determined that WhistlePig's proposed "farm-based" distillery would be subject to Act 250 jurisdiction.

WhistlePig owns several parcels of farm land in Shoreham, Vermont. On some of this property, WhistlePig operates offices and a bottling facility for whiskey imported from Canada. In a separate proceeding from the appeal now before us, WhistlePig is seeking an after-the-fact state land use permit for this already constructed and operating development, which includes associated storage for aging distilled rye whiskey, and other additional improvements, including construction of a still, associated with distilling whiskey from grain that WhistlePig purchases from non-affiliated farms. This development is not the subject of the JO appealed here, but rather is the subject of a separate Act 250 permit application now pending before the District 9 Environmental Commission ("District Commission").

In the pending JO appeal, WhistlePig seeks review and a determination that it does not need an Act 250 permit for a second still it proposes to develop for distilling rye whiskey using rye grain grown solely on farms that it owns or leases ("the farm-based still" or "the second still"). WhistlePig requested that the District Coordinator issue a jurisdictional opinion that this second still would be exempt from Act 250 jurisdiction under the farming exemption. When the District Coordinator determined that the proposed second still was not entitled to a "farm-based" Act 250 exemption and would therefore require a permit, WhistlePig filed a timely appeal with this Court.

1

Appearing in this appeal are WhistlePig, LLC, and its managing member, Raj Bhakta, both of whom are represented by Jon Anderson, Esq.; neighboring property owners Solar Haven Farm, LLC and its members, George Gross and Barbara Wilson (collectively "Solar Haven Farm"), all of whom are represented by Gerald Tarrant, Esq.; and the Vermont Natural Resources Board ("the NRB"), represented by Melanie Kehne, Esq.

WhistlePig moved for summary judgment in its favor that its farm-based still is exempt from Act 250 jurisdiction as a matter of law. Both Solar Haven Farm and the NRB oppose WhistlePig's motion and have cross-moved for a ruling on summary judgment that the proposed project requires an Act 250 permit. We address all pending motions in this Decision.

## Factual Background

For the purposes of analyzing the pending summary judgment motions, we consider the following material facts, which we understand to be undisputed, unless otherwise noted:

1.    Raj Bhakta and/or WhistlePig, LLC own or control several parcels of farm land in the Town of Shoreham, Vermont.

2.    In 2010, WhistlePig requested[1] and received a Project Review Sheet ("PRS") which included a jurisdictional opinion that stated that certain activities constituted development and required an Act 250 permit. These activities were described as: "Conversion of an existing dairy barn into a farm based distillery. Phase I consists of importing, processing, bottling, warehousing and shipping [distilled whiskey]." Phase I site improvements included the addition of a filtering treatment system to the existing water source and a new connection to an existing septic system. Phase II consists of construction of a "farm based distillery." See Project Review Sheet, issued on April 1, 2010 by the District 9 Environmental Commission Coordinator at 1 (a copy of which was provided as Attachment 1 to Solar Haven Farm's Responsive Memorandum, filed Dec. 3, 2013) (hereinafter referred to as the "2010 PRS").

3.    In response to the information supplied on WhistlePig's behalf, the District Coordinator issued the 2010 PRS. In particular, the District Coordinator noted on the 2010 PRS that the

---

[1] The 2010 Project Review Sheet notes that the project review was requested by David Pickerell of Oak View Consulting, who we understand was a designated representative working on behalf of WhistlePig. The District Coordinator reviewed information about the proposed project provided by Mr. Pickerell. In fact, we are unaware of any other information provided by any other person or entity that the District Coordinator relied upon in rendering the 2010 Project Review Sheet.

described activities, including the "Phase I" and "Phase II" activities, constituted "construction of improvements for commercial use" that required an Act 250 permit in order to be lawfully developed as proposed. Id.

4. The 2010 PRS also gave notice to WhistlePig that the Phase I and Phase II development would need a state wastewater permit. Id.

5. WhistlePig did not ask for reconsideration of this jurisdictional opinion nor did it appeal the 2010 PRS determinations.

6. The record before us does not reveal that the 2010 PRS was published in a local newspaper or served upon the necessary parties, which 10 V.S.A. § 6007(c) directs "if a requestor wishes a final determination to be rendered on the question."

7. Later in 2010, WhistlePig began construction of office facilities, a whiskey bottling facility, and associated parking on its Shoreham farm lands without an Act 250 permit.

8. The NRB inquired of WhistlePig about the propriety of its development without first obtaining an Act 250 permit, particularly since the 2010 PRS provided notice to WhistlePig of the District Coordinator's determination that a permit was necessary for its proposed commercial development. WhistlePig represented that it did not believe that its current development required an Act 250 permit, because they had "modified their project and obtained a decision from the Permit Specialist stating that no [wastewater treatment] permit was required from the Wastewater Management Division." Land Use Panel of the Natural Resources Board v. Raj Bhakta and WhistlePig, LLC, No. 95-7-13 Vtec, Order and Assurance of Discontinuance at 3 (Vt. Super. Ct. Envtl. Div. Aug. 12, 2013) (copy attached as Exhibit 1 to Solar Haven Farm's Responsive Memorandum, filed Dec. 3, 2013) (hereinafter referred to as "the 2013 AOD").

9. WhistlePig ultimately agreed that their proposed commercial development required an Act 250 permit. Pursuant to the 2013 AOD, WhistlePig stipulated that their already constructed and operating commercial development required an Act 250 permit and agreed to pay a fine to the NRB of $18,750.00, in light of their permit violation. Id.

10. Pursuant to WhistlePig's ongoing negotiations with the NRB, WhistlePig submitted, on November 16, 2012, an Act 250 permit application for the development already undertaken as

well as additional development activity, including a still and associated facilities for aging and storing the whiskey produced. WhistlePig concedes that this development is subject to Act 250 jurisdiction.

11. On December 3, 2012, WhistlePig requested a jurisdictional opinion from the District 9 Environmental Commission Coordinator, Geoffrey Green ("the District Coordinator"), pursuant to 10 V.S.A. § 6007(c). In this request, WhistlePig asked whether a proposed second still, located on some unspecified portion of WhistlePig property, that would involve the processing of grain grown on WhistlePig property, as well as the associated aging and storage facilities, would be exempt from Act 250 jurisdiction.

12. WhistlePig has yet to determine the specific location of this second still, in which only grain grown on property owned or leased by WhistlePig would be distilled, or the location of the related aging and storage facilities. It appears that the "farm-based" still would be located on property WhistlePig already owns, adjacent to the existing commercial distillery or on other property within a five-mile radius of the commercial distillery.

13. WhistlePig appears to represent that wherever the farm-based distillery operations are located, whiskey distilled there would be bottled at the same location as the whiskey distilled or processed at its commercial operation. (See WhistlePig's responsive Memorandum, filed Nov. 19, 2013, at 1 n.1.)

14. The process of distilling rye whiskey is generally undisputed. Rye grain is converted to glucose in a mixture of enzymes and water. Yeast is used to convert the glucose into ethanol in a solution that is primarily water. Much of this water is evaporated through the distilling process and the result is a mixture that is primarily ethanol and commonly referred to as "new whiskey." Water is added and the mixture is then aged in barrels where additional water and ethanol evaporate. The specific quantities of water, rye, yeast, enzymes, and any other ingredients that go into this process are either disputed or uncertain.

15. The extent to which Act 250 jurisdiction attaches to WhistlePig's commercial activities is unknown as WhistlePig has not received an Act 250 permit for the existing development. Thus, any relationship between WhistlePig's development activities subject to Act 250 and those activities that are the subject of this appeal is either unknown or disputed.

4

**Discussion**

The cross-motions for summary judgment raise three issues. First and most importantly is whether the project described by WhistlePig constitutes "farming" under the relevant Act 250 statute, rules, and interpretive caselaw. WhistlePig argues that the project constitutes farming and is therefore exempt; Solar Haven Farm and the NRB argue the opposite. Second, even if the project constitutes "farming," Solar Haven Farm and the NRB both argue that because the other associated development is subject to Act 250, the proposed second still is subject to Act 250 jurisdiction regardless of whether it might otherwise be exempt. Finally, the parties dispute the relevance of the 2010 PRS issued to WhistlePig which contains a jurisdictional opinion ("the 2010 JO") that the WhistlePig project, as described in the PRS, is subject to Act 250 jurisdiction. WhistlePig argues that the 2010 JO is not final and binding on them, and Solar Haven Farm disagrees. Rather than address the three motions individually, we will consider the three legal issues in turn and address the motions with respect to each issue together.

I.      **Summary Judgment Standard**

We will grant summary judgment if a moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a). When considering cross-motions for summary judgment, the Court considers each motion individually and gives the opposing party the benefit of all reasonable doubts and inferences. City of Burlington v. Fairpoint Commc'ns, Inc., 2009 VT 59, ¶ 5, 186 Vt. 332.

II.     **Whether the proposed farm-based still, and associated storage for aging whiskey, is "farming" exempt from Act 250 Jurisdiction.**

We begin our analysis by noting that Act 250 generally requires review of significant development and its impact upon neighbors, neighboring properties, and the environment, so as to "ensure economic growth without environmental catastrophe." Southview Assocs. Ltd. v. Bongartz, 980 F.2d 84, 87 (2d Cir. 1992) (cert. denied, 507 U.S. 987 (1993)). As with any general legal provision, there are exceptions to this general Act 250 permitting requirement. However, the party seeking an exemption bears the burden of proving the exemption and "[t]he farming

5

exemption, like all exemptions, is to be read narrowly and only applied when the facts clearly support the exemption's application." In re Ochs, 2006 VT 122, ¶ 12, 181 Vt. 541 (citations omitted).

The primary question in this appeal is the merits of WhistlePig's claim that the proposed second still, where WhistlePig will distill grain grown on its own farmland, is exempt from Act 250 because it does not constitute "development" under Act 250. 10 V.S.A. § 6001(3)(A). The Act 250 definition of development expressly exempts construction and use of land improvements for farming. Therefore, as long as the proposed operation fits Act 250's statutory and caselaw definition of "farming," an Act 250 permit is not required. 10 V.S.A. § 6001(3)(D)(i).

Farming is defined to include "the on-site storage, preparation and sale of agricultural products principally produced on the farm . . . ." 10 V.S.A. § 6001(22)(E) (emphasis added). Thus, if the rye whiskey WhistlePig proposes to produce constitutes an "agricultural product principally produced on the farm," the still and the whiskey storage and aging facility are exempt from Act 250 jurisdiction.

The parties here seem to agree that the question of whether WhistlePig's rye whiskey will be an "agricultural product" is dependent upon the question of whether the whiskey is "principally produced" on the farm. An agricultural product is "principally produced" on the farm if "more than 50% (either by volume or weight) of the ingredients or materials contributing to [the] final agricultural product which results from the activities stated in 10 V.S.A. § 6001(22)(A) - (D),[2] and which is stored, prepared or sold at the farm, is grown or produced on the farm." Natural Resources Board Act 250 Rules, Rule 2(C)(19), Code of Vt. Rules 12 004 060, available at http://www.lexisnexis.com/hottopics/codeofvtrules ("Rule 2(C)(19)" or "the Rule").

The parties dispute how this standard should be interpreted, specifically relating to three issues. First, the parties dispute whether ingredients used in the production of an

---

[2] "'Farming' means: (A) the cultivation or other use of land for growing food, fiber, Christmas trees, maple sap, or horticultural and orchard crops; or (B) the raising, feeding, or management of livestock, poultry, fish, or bees; or (C) the operation of greenhouses; or (D) the production of maple syrup . . . ." 10 V.S.A. § 6001(22)(A)–(D).

agricultural product but not present in the final product must be considered in determining whether the product is principally produced on the farm.  Second, the parties dispute whether water counts as an ingredient or material contributing to the final agricultural product.  Finally, if water is an ingredient, the parties also dispute whether the source of the water is relevant in determining whether it counts as an ingredient or material produced on the farm.

Our "paramount goal" in construing statutory language is to implement the intent of its drafters.  Colwell v. Allstate Ins. Co., 2003 VT 5, ¶ 7, 175 Vt. 61.  In doing so, we first presume that the legislature intended the words used be given their plain and ordinary meaning.  Pease v. Windsor Development Review Bd., 2011 VT 103, ¶ 17, 190 Vt. 639 (citations omitted).  When statutory language is plain and unambiguous, it is enforced "according to its terms without resort to statutory construction."  Colwell, 2003 VT 5, ¶ 7 (citations omitted).  If interpretation is required, we must "interpret the statute as a whole, looking to the reason and spirit of the law and its consequences and effects to reach a fair and rational result."  Miller v. Miller, 2005 VT 89, ¶ 14, 178 Vt. 273 (quoting In re Margaret Susan P., 169 Vt. 252, 262 (1999)).  We follow these directives in our efforts to bring clarity to the legal issues the parties have presented.

A.    *What ingredients must be considered in determining whether an agricultural product is principally produced on the farm?*

Regarding the first issue, we find that Rule 2(C)(19) requires accounting for all ingredients used in the preparation of a final agricultural product, not just those ingredients remaining in the product.  The plain language of the Rule supports this interpretation, since the statute directs an accounting of any ingredients that are "contributing" to a final product; the statute does not limit the accounting to only those ingredients remaining in the final product.

The provisions in question relate to the production of value-added products from ingredients or materials grown or produced on a farm.  The process of creating these value-added products often involves manipulation of the ingredients over many processes.  Thus, there may be many "ingredients," as that term is commonly understood, that do not appear in the final product, but that nevertheless "contribute" to the final product.  For example, the final product at issue here, rye whiskey, does not contain any rye grain.  This is a necessary ingredient that contributes to the creation of whiskey but does not remain in the final product. We therefore interpret the statute and Rule to require consideration of all of the ingredients or

7

materials that go into the process of creating the product and not only the components of the final product itself. This interpretation follows from the plain meaning of the words chosen by the legislative drafters and reaches a fair and rational result.

In reaching this conclusion, we specifically reject WhistlePig's assertion that only the "ingredients remaining in the final product" should be relevant because it is unsupported by the plain meaning of the words that the drafters used. Perhaps even more compelling, however, is the abject confusion that would result, should we adopt WhistlePig's assertion. Were we to conclude that only the ingredients remaining in the final product are relevant to an analysis of whether it is an "agricultural product principally produced on the farm," we would be condemning every applicant, every neighbor of a project, every district commission coordinator, and every judge assigned to the Environmental Division to embark on a complex analysis of the "ingredients" remaining in a final product asserted to be principally produced on a farm and therefore exempt from Act 250 review. In fact, since the recipe and process used to make rye whiskey, or split pea soup for that matter, can vary from one chef to another, WhistlePig's assertion would require a detailed analysis of each "ingredient" remaining in every product asserted to be "agricultural" in nature, thereby rendering Act 250 jurisdictional determinations unmanageable. We decline to adopt such a convoluted, unsupported manner of computation.

The words used in 10 V.S.A. § 6001(22) and Act 250 Rule 2(C)(19) are straight-forward and direct: the ingredients that contribute to a product must be assessed by weight and volume. If more than half of those ingredients are identified as products from farming (as defined in 10 V.S.A. § 6001(22)(A)–(D)), then the final product may be defined as an "agricultural product principally produced on the farm," the production of which may be exempt from Act 250 jurisdiction.

B.    *Can water count as an ingredient contributing to a final agricultural product?*

For similar reasons we also conclude that the water that goes into the production of the value-added products must be considered in determining whether more than 50% of the product ingredients come from the farm. Where water is used as an ingredient or material contributing to the final agricultural product, nothing in the statute indicates that it can be

excluded. The plain language of the Rule includes by volume or weight all "ingredients or materials contributing to a final agricultural product." If water is one of those ingredients, it must be counted.

C. *Does the source of the water matter in considering whether it is an ingredient grown or produced on the farm?*

The remaining issue is whether the water used counts towards the percentage of ingredients "grown or produced on the farm" if it comes from the farm. Neither this Court nor the prior Environmental Board has squarely addressed this question. However, the Vermont Supreme Court, in its decision in Houston v. Town of Waitsfield, 162 Vt. 476 (1994), provides help for our analysis. In that case, the landowner sought a permit to extract and sell spring water from an aquifer underlying her property. "Agricultural uses" were permitted as of right in the relevant zoning district, whereas "small-scale processing of raw agricultural or forestry products" was a conditional use. Id. at 477–78 nn.2–3. Both the Superior and Supreme Courts only considered whether the extraction of the water was a permitted "agricultural use." The Supreme Court held that the "raising" of water from the ground was not an agricultural use and that the water, itself, was not an agricultural product. Id. at 479. Thus, if water is the final product, the processing or bottling of the water is not exempt from Act 250 under the farming exemption. This does not, however, answer the question of how to classify water that is used as an ingredient in the production of a value-added agricultural product.

Under the plain language of Rule 2(C)(19), the question is not whether the water is an agricultural product itself, but whether the water is an ingredient "grown or produced on the farm" as required by the Rule. As noted above, the Rule specifically defines agricultural products as resulting from the activities listed in 10 V.S.A. § 6001(22)(A)–(D). Therefore, if either the final product itself or more than 50% of the ingredients contributing to the final product result from those activities, the production and storage of that product is exempt from Act 250 jurisdiction. This follows from the plain language of the Rule and implements the drafters' intent, specifically evidenced by their decision to reference in the Rule the list of "farming activities" itemized in the statute.

9

Second, we rely upon a whole reading of the applicable statute and Rule to arrive at a determination of whether the drafters intended for water to be included as an ingredient grown or produced on the farm. It is apparent that the Legislature intended to exempt farming and agricultural production from the encumbrance of Act 250 regulation, but that it selected limiting language, so that the agricultural exemption would not be interpreted to apply to farm production that it did not intend to exempt. Thus, the Legislature chose to narrow the scope of farm-related activities that would be exempt.

We offer the following example to illustrate this point. Years ago, some Vermont farms included sand and gravel extraction operations to help supplement farming revenue. Such operations, while once common on Vermont farms, did not convince the Legislature to include sand and gravel in its list of agricultural items that are exempt from Act 250 review. We do not interpret this as a legislative intent to ban sand and gravel operations from Vermont farms. Rather, any Vermonter may develop and operate a sand and gravel operation on their farm, provided that they first disclose their proposed operation, allow it to be subject to Act 250 review, and secure an Act 250 permit.

The appeal before us reminds the Court that there are occasions where individuals expend more effort in evading Act 250 review than they may be required to expend in disclosing their proposed development plans, allowing their plans to be reviewed under the applicable Act 250 criteria, and securing an Act 250 permit. We are unaware, given the facts thus far presented, whether this applies to WhistlePig.

For these reasons, we conclude that the water that contributes to the creation of WhistlePig's rye whiskey must be compared to the other ingredients used in the creation of its whiskey, and does not count towards the percentage of ingredients grown or produced on the farm, regardless of its source. If the ingredients from activities that fall within 10 V.S.A. § 6001(22)(A)–(D) constitute, by weight or volume, more than 50% of the total of all ingredients, then WhistlePig's distillery and related operations may qualify for a farming exemption from Act 250 jurisdiction, pursuant to 10 V.S.A. § 6001(3)(D)(i). If the agricultural items do not constitute more than 50%, then WhistlePig's second still must comply with Act

10

250, even if the rye used in this second still is wholly grown on WhistlePig lands. The applicable statutes and Act 250 Rules direct this outcome.

We recognize that our determinations here do not result in a final determination of the pending appeal. A request for a jurisdictional opinion is a unique procedure, since it in effect is a statutory authorization for a district coordinator, and this Court on appeal, to render an advisory opinion as to whether a proposed development requires a state land use permit. See 10 V.S.A. § 6007(c). The jurisdictional opinion rendered has limited value, since it only governs the development as represented by the party requesting the opinion. Further, due to the statutory changes implemented as part of the Permit Reform Act of 2004, the jurisdictional opinion issued may only constitute a final determination when the requesting party sees to the publication of the opinion in a local newspaper and arranges to have the opinion served upon any "adjoining property owner or other person who has a particularized interest" that may be affected by the proposed development. Id.; 10 V.S.A. § 6085(c)(1)(E).

We also note that district coordinators issue jurisdictional opinions without first conducting an evidentiary hearing. Thus, the opinions issued by the coordinators are, by their nature, based on hypotheticals, and are "only as good as the facts upon which [they are] based." In re Lake Champlain Bluegrass Festival, No. 204-11-10 Vtec, slip op. at 11 (Vt. Super. Ct. Envtl. Div. Jan. 3, 2012) (Durkin, J.).

Unlike the district coordinators, when a jurisdictional opinion is appealed to this Court, we are directed to conduct a de novo evidentiary hearing and render an opinion upon whether the development as proposed will require an Act 250 permit. 10 V.S.A. §§ 8503(b)(2), 8504(a), and 8504(h) (2004) (amended 2013).[3] To render such an opinion, we must receive a clear, unambiguous description of the proposed project and all of its components, an identification of the property which it will occupy, and a description of any construction or other improvements that will be completed to support the proposed project. If we do not receive clear descriptions

---

[3] In 2013, after the JO that is on appeal here was issued and appealed, the statutory provisions related to jurisdictional appeals were amended. The Natural Resources Board now hears appeals from JO determinations by district coordinators and only then can the Board's decision on the JO be appealed to this Court. See 10 V.S.A. §§ 6007(d), 8503(b)(2), and 8504(h). We have yet to witness this differing process for jurisdiction opinion appeals.

of each of these components, we may be required to decline to render a jurisdictional opinion,[4] or rather render an opinion on whatever credible facts may be presented by other parties. Given the lack of clarity thus far in the description of the proposed project, its components, and its specific location (including a detailed site plan), we decline to render summary judgment for or against WhistlePig's request.

We offer the legal determinations in this Decision in an effort to guide the parties in their preparations for the anticipated merits hearing. While our determinations here are not final, since they await a trial, we do not anticipate revisiting these legal issues or reconsidering our legal determinations without good and sufficient cause.

### III.     Even if "farm-based still" is exempt, would "amendment jurisdiction" apply?

The second issue raised by the parties is whether, even if otherwise exempt from Act 250 jurisdiction, the second still is subject to Act 250 review based on its relationship with the first still, bottling line, and other WhistlePig operations that are subject to Act 250. In its concurrent Act 250 Permit application, WhistlePig seeks to limit Act 250 jurisdiction to those portions of the farm associated with the non-farm-based still and associated bottling line. With jurisdiction so limited, they argue amendment jurisdiction does not attach to the farm-based still. Solar Haven Farm and the NRB both argue that the farm-based still should be considered an amendment to the pre-existing development that is subject to Act 250 jurisdiction. Our determination here depends upon some facts not yet presented by the parties. We therefore decline to render summary judgment to any party.

Development otherwise exempt from Act 250 under the farming exemption may still be subject to Act 250 jurisdiction if the new development has a certain connection or proximity to an existing development already subject to Act 250. In re Eustance, 2009 VT 16, ¶¶ 19–22, 185 Vt. 447. A permit amendment is not required for farming that will occur on preserved primary agricultural soils or for farming that does not conflict with any condition of an existing Act 250

---

[4] It is not the role of the District Coordinator, or this Court on appeal, to advise a developer on what set of facts would or would not trigger Act 250 jurisdiction, but instead to decide whether the proposal put before it does or does not trigger Act 250 jurisdiction. Otherwise, we risk giving an advisory opinion without an actual case or controversy being presented to the Court. See Doria v. Univ. of Vt., 156 Vt. 114, 117 (1991) ("Unless an actual or justiciable controversy is present, a declaratory judgment is merely an advisory opinion which we lack the constitutional authority to render.").

permit.  10 V.S.A. § 6081(s)(1).  We decline to render a ruling on this legal question, however, because material facts remain disputed or uncertain.  We agree with Solar Haven Farm and the NRB that WhistlePig cannot benefit from its decision not to obtain the required Act 250 permit before undertaking the existing development of the offices and bottling facility.  However, until the District Commission completes its review of the existing development and we have more information on WhistlePig's farm-based still, we cannot determine whether WhistlePig has established that the second farm-based still could be exempt from Act 250 and not the cause of such a material impact as to trigger Act 250 amendment jurisdiction.  See Eustance, 2009 VT 16, ¶ 20 ("Subsequent applicants are bound by the terms and conditions of the original permit unless it is modified."  (citing In re Stowe Club Highlands, 166 Vt. 33, 37 (1996))); see also Natural Resources Board Act 250 Rules, Rule 34, Code of Vt. Rules 12 004 060, available at http://www.lexisnexis.com/hottopics/codeofvtrules (requiring permit amendment for any material change).

IV.     **Precedential Value of the 2010 PRS and 2013 AOD**

The final legal issue raised in the pending motions is whether the current JO appeal is somehow barred by the determinations in the 2010 PRS.  The 2010 PRS states that the project requires an Act 250 permit.  The project is described as: "Conversion of an existing dairy barn into a farm based distillery.  Phase I consists of importing, processing, bottling, warehousing and shipping.  Modification of an existing water source by adding filtering treatment, construction of a connection to an existing septic system.  Phase II consists of construction of a farm based distillery."  WhistlePig did not appeal this jurisdictional opinion.

Solar Haven Farm argues that this procedural background precludes WhistlePig from now seeking the JO currently under appeal.  WhistlePig argues that the JO was never properly served on all interested persons as required under the applicable rules and therefore was not final as a matter of law.  See 10 V.S.A. § 6007(c) ("If a requestor wishes a final determination to be rendered on the question, the district coordinator, at the expense of the requestor and in accordance with rules of the board, shall publish notice of the issuance of the opinion in a local newspaper generally circulating in the area where the land which is the subject of the opinion is located, and shall serve the opinion on all persons listed in subdivisions 6085(c)(1)(A) through

(D) of this title."). We have no evidence before us that the District Coordinator published the 2010 PRS or had WhistlePig serve it on the identified interested persons.

WhistlePig did, however, enter into an Assurance of Discontinuance ("AOD") with the NRB through which WhistlePig admitted that it requested the 2010 jurisdictional opinion and did not appeal it. This AOD was entered as a judicial order by this Court on August 12, 2013. By that Order and the underlying AOD, WhistlePig acknowledges that it had received the 2010 PRS that gave notice that its proposed operations ("Phase I" and "Phase II") required an Act 250 permit. The AOD also amounts to an acknowledgement by WhistlePig that its assertion that its proposed distilleries had changed enough to no longer need an Act 250 permit was insufficient to serve as a foundation for WhistlePig to avoid the requirements of Act 250.

It is undisputed that if WhistlePig wanted the 2010 jurisdictional opinion to be final, it had to comply with the notice and service requirements. These requirements were not met. Were we left with those facts alone, our analysis would finish with a determination that the 2010 PRS was not made final and does not have a bearing on a proposed future development like that described in the 2010 PRS. However, the 2013 AOD, made final by this Court's August 12, 2013 Order and stipulated to by WhistlePig and the NRB, is now in and of itself a final determination. We therefore focus our attention on the terms of the 2013 Order and AOD.

Perhaps it is a mere coincidence that WhistlePig again relies upon an assertion that its project plans have changed so much so that its farm-based still, at least, becomes exempt from Act 250. The 2013 Order and AOD reference the 2010 PRS and it is upon that project description that we will rely in determining whether the 2013 AOD forecloses WhistlePig's right to assert a farm-based exemption. However, we remain uncertain of the specifics of WhistlePig's current project plans and therefore cannot determine how similar those plans are to what WhistlePig proposed in 2010, or for that matter in 2013. That lack of detail also prevents us from rendering a jurisdictional opinion, at least at this pre-trial stage, on the question of whether WhistlePig's newest project plans call for integration between its commercial still and farm-based still (including a unified bottling plan) such that Act 250 jurisdiction attaches to all of WhistlePig's production plans. We therefore await a full and

14

complete disclosure at trial of WhistlePig's plans. Absent good and sufficient cause, we will apply our legal determinations here to the credible facts presented at trial.

## Conclusion

Because the Court does not have sufficient undisputed facts before it to determine whether WhistlePig has met the burden of establishing that its proposed farm-based still is exempt from Act 250 jurisdiction, WhistlePig's motion for summary judgment is **DENIED**. Similarly, because neither Solar Haven Farm nor the NRB have come forth with sufficient undisputed material facts to determine that Act 250 Jurisdiction attaches to WhistlePig's proposed farm-based still as a matter of law, their motions for summary judgment are also **DENIED**. In light of our determinations here, the outstanding legal issues can only be addressed after a full evidential presentation at trial. The parties should be prepared to answer these factual questions at trial so that we may render a final determination on the legal issues we have attempted to outline in this pre-trial decision.

Done at Newfane, Vermont this 11th day of April, 2014.

_____
Thomas S. Durkin, Environmental Judge

15