STATE OF VERMONT
SUPERIOR COURT – ENVIRONMENTAL DIVISION

| | { | |
|---|---|---|
| **In re UVM Certificate of Appropriateness** | { | **Docket No. 90-7-12 Vtec** |
| | { | |

## Decision on the Merits

Currently before the Court is the City of Burlington (City) Development Review Board's (DRB) June 5, 2012 issuance of a certificate of appropriateness to the University of Vermont (UVM) for its plans to improve an existing athletic field with open air bleachers, lights, a press box, bathrooms, locker rooms, a concession stand, paving, and landscaping (the Project). The DRB considered the Project to be a permitted, rather than conditional, use under the City of Burlington Comprehensive Development Ordinance (CDO). Burlington resident Pike Porter appealed the decision and submitted a Statement of Questions. Burlington residents Chris Flinn and Mary Grinnell entered appearances to participate in Mr. Porter's appeal as interested persons pursuant to V.R.E.C.P. 5(c).

In light of our rulings on pretrial motions, the legal issues remaining for trial were the following questions from Mr. Porter's Statement of Questions, filed October 17, 2012:

4. Do the proposed lights violate the building height restrictions in Sect. 4.5.2(d)5[1] and Sect. 5.2.6 and Sect 6.0.1(f)(j)(k)(l)(n)?

5. Do the lights comply with Sect. 5.5.2(f)8 Outdoor Recreational Facility Lighting?

8. Did applicant demonstrate, and is the project [in] compliance with applicable nuisance regulations for non-UVM related activities at the project in accordance with Sect. 5.5.1?

10. Does the project violate the City of Burlington and University of Vermont Memorandum of Agreement RE: 2009 Zoning Amendments?

11. Does the project meet the standard identified in Article 6.2.2? Are traffic, circulation, pedestrian access, impact study required per Article 6.2.2 (i)(j)(k)(l)(o)(p)?

13. Does the project intrude into surrounding residential neighborhoods in violation of 4.5.2(b)4, and 6.0.1(f)?

---

[1] We assume that the reference to 4.5.2(d)5 is a typographical error, as that section sets out height restrictions for the Central Campus overlay, not the South of Main Street Campus Overlay where the Project is located. Thus, we understand this question to reference CDO § 4.5.2(f)(5).

The Court conducted a site visit to the Property on the morning of the April 9, 2013 merits hearing. The hearing was held at the Vermont Superior Court, Chittenden Civil Division in Burlington, Vermont and concluded on April 10, 2013. UVM and its lawyer, John Collins, Esq., appeared at the site visit and participated at trial. The City of Burlington and its lawyer Kimberlee J. Sturtevant, Esq. appeared at the site visit and participated at trial. Pike Porter, Chris Flinn, and Mary Grinnell, all appearing pro se, were also present at the site visit and trial. Several of the parties' witnesses attended the site visit and testified during the merits hearing.

Based upon the evidence presented at trial, including that which was put into context by the site visit, the Court renders the following Findings of Fact and Conclusions of Law.

## Findings of Fact

1. The athletic field in question (Virtue Field) is located on UVM's main campus on an open parcel on the west side of Spear Street, near the Gutterson athletic facility.

2. The Project is in the immediate vicinity of another athletic field, a large athletic building complex (Patrick Gymnasium, Forbush Natatorium, and Gutterson Field House), open space, and parking lots.

3. UVM seeks approval for a 3.8 million dollar project to improve the existing playing field with open air bleachers, 70-80 foot tall lights, a press box, bathrooms, locker rooms, a concession stand, paving, and landscaping.

4. The proposed lights are arranged on four poles; two on the west side and two on the east side of Virtue Field. The west side lights will be 70 feet tall and the east side lights will be 80 feet tall. The east lights are ten feet higher than the west lights because they are located further away from the field.

5. Virtue Field hosts UVM men's and women's NCAA Division I soccer and lacrosse practices and games. The field also hosts intramural sports, physical education classes for credit toward UVM degrees, and significant high school athletic events.

6. UVM athletics aspires to compete at the national level which requires top of the line facilities and scholarships for improved recruiting and an increase in the level of competition.

2

7. Virtue Field, without the proposed improvements, satisfies the minimum NCAA standards for regular season athletic events. The field has deficient seating and no lights, however, and is not considered a possible venue for NCAA post-season or playoff events.

8. Virtue Field has an artificial turf surface that can withstand a higher volume or frequency of use than a natural turf field.

9. Without lights, late fall soccer practice and games and early spring lacrosse practice and games must start at 2:00 PM to allow for sufficient lighting, as practice and games take from 1.5 to 2.5 hours to complete. The early- to mid-afternoon timeframe is difficult for participants and spectators. The installation of lights will allow later practice, games, and use of the field.

10. The proposed intramural use of the field may include up to three concurrent games. Even through intramural use may have a larger number of athletes participating at one time, the overall impact of intramural use as compared to varsity events is similar, because intramural use will not typically include many spectators, and there will be no public announcement system use as well as less traffic.

11. Insufficient lighting for soccer and lacrosse events present safety concerns for the athletes. Both a soccer ball and lacrosse ball can be kicked or thrown at high speeds and can cause injury. Lacrosse is particularly dangerous due to the combination of a small ball and the high speed at which it flies through the air. Lacrosse is one of the fastest NCAA ball sports.

12. "Light spill" refers to light that crosses a property line. It is different and distinct from an ability to see light generated on one property from an adjoining property.

13. "Skyglow" is light which is reflected upward toward the sky and is created by light leaving a light fixture and reflecting upward. The fixtures proposed for Virtue Field are full cut-off fixtures[2] designed to minimize skyglow. Nevertheless, some light generated by the proposed lighting system will reflect off of the field and contribute to skyglow. Atmospheric conditions will also impact skyglow.

14. The proposed lighting for Virtue Field is designed to NCAA broadcast levels or standards; which in turn relate to player safety and performance.

---

[2] As the fixtures are designed as cut-off, CDO § 55.5.2(f)(8)(C) is not relevant to our analysis.

15. A more elevated light fixture will result in less light spill and better light performance, including more uniform lighting of the field. Light fixtures on shorter poles at Virtue Field would likely have greater impacts on neighbors than more elevated fixtures.

16. 60 or 62-foot high lights at Virtue Field, compared with lights at 70 or 80 feet, may increase light spill, would create less uniform lighting on the field resulting in safety concerns for athletes, and would likely increase glare for the competitors by 2 to 3 times the magnitude. Also, shorter light poles would require more light fixtures and more electricity.

17. The proposed light fixtures will be 75 foot candles. A foot candle is the measure of candle light in a one-square foot area.

18. Intercollegiate athletics are growing in popularity and the competitive level is rising, resulting in an increase in fields with lighting. Four pole, 75 foot candle lighting systems for university athletic fields are common and are considered the present industry standard for soccer and lacrosse fields.

19. There would be no difference in impact to neighbors between the use of 50 or 75 foot candle lighting for the project.

20. For zoning purposes, the Project site lies within the Institutional District and is subject to the UVM South of Main Street Campus Overlay District (ICC-UVMS District).

21. As of January 1, 2008, the actual height of the tallest existing structure within the ICC-UVMS District was the tallest of the University Heights buildings, with a building height of 62 feet.

22. Mr. Porter resides at 544 South Prospect Street on property deeded to his wife. At its closest point, the athletic field lies approximately 1,705 feet from their residence. The closest light is approximately 1,795 feet from their house. Mr. Porter may be able to see one of the four proposed lighting structures from his property.

23. Mr. Flinn resides at 295 Prospect Street, on the west side of the street. The approximate distance from the southeast edge of Mr. Flinn's property and the closest edge of the athletic field is approximately 1,930 feet. The closest light is approximately 2,050 feet from his house. Mr. Flinn will not be able to see the lights or light poles from his property.

24. Ms. Grinell resides at 93 Robinson Parkway. The approximate distance from the south side of the Grinell property to the nearest two proposed light poles is approximately 2,160

4

and 2,060 feet. Ms. Grinell will not be able to see the lights or light poles from her property.

25. None of these three neighbors will be able to see lighting on the ground at Virtue Field.

26. The Project does not include curb cuts, secondary access points, or driveway improvements.

27. The Project does not include new parking facilities. The project will use existing parking lots, including the Gutterson Garage with 1,280 parking spaces in and around the facility. There is also parking available in parking lots across Main Street near Jeffords Hall and Given. At times of high spectator volume, shuttles transport spectators from these more remote lots to Virtue Field. Vehicles entering and exiting Gutterson Garage from Spear Street may also exit to Main Street.

28. Except for special events, such as a visit from the Governor of Vermont or the President of the United States, traffic exiting the Gutterson Garage is not allowed to use South Prospect Street.

29. UVM has installed traffic control measures including signs and gates to prevent UVM traffic from exiting onto South Prospect Street. Enforcement has also increased traffic fines for exiting onto South Prospect Street.

30. The Project will increase the number of bleacher seats at Virtue Field from 300 to 2,500.

31. The Project is located in a "Shared Use" area for parking considerations.

32. The University's Joint Institutional Parking Management Plan 2009-2014 and the 2012 and 2013 Annual Updates demonstrate that UVM had 1,195 excess spaces in 2008 and is projected to have 1,290 excess spaces in 2014.

33. The Project includes the construction of new walkways connecting pedestrian paths at Virtue Field to the campus-wide walkway network. This network includes pedestrian pick up and drop off points for UVM's campus bus and shuttle system.

34. The Project access ways are designed to be handicapped accessible.

35. The Project is designed to mitigate visual and audible impacts.

36. Utilities at the Project are planned to be installed underground and no new ground mounted mechanical equipment is proposed for the Project.

<u>**Conclusions of Law**</u>

Our review of UVM's proposed Project is limited to addressing the questions raised by Appellant Porter in his Statement of Questions. See V.R.E.C.P. 5(f). As outlined above, six of Appellant Porter's questions require analysis in this merits review. We address each question in turn.

**I.** **The proposed lights do not violate the building height restrictions in CDO §§ 4.5.2(f)(5), 5.2.6, and 6.0.1(f), (j), (k), (l), and (n) and the lights comply with CDO § 5.5.2(f)(8)—Outdoor Recreational Facility Lighting.**

Mr. Porter's Question 4 asks, in part, whether the proposed lights violate CDO §§ 6.0.1(f), (j), (k), (l) and (n). Parts (j), (k), (l), and (n) of CDO § 6.01 apply only "within any mixed-use zoning district as defined in Article 4." See CDO § 6.0.1. Because Article 4 does not classify the district in which the Project is located as a mixed use district (see CDO § 4.3.1), we do not address CDO § 6.01(j), (k), (l), and (n).

CDO § 6.01(f) requires all development in the City to address certain enumerated development principles "as applicable," including the directive to "[c]omplement Burlington's architectural and cultural heritage by conserving and/or reflecting dominant design elements and characteristics of neighborhoods, and maintaining neighborhood proportions of scale and mass." We note first that the Project is not located in a "neighborhood" in the residential sense that this development principle seems to imply; rather, it is located in the middle of UVM's athletic campus. Thus, to the extent that the development principles are to apply "as applicable," it is not clear that this principle is applicable in this case. Even if it were, the Project does reflect dominant design elements and characteristics of the area in which it is located, because, as admitted exhibits show, the Project is in the immediate vicinity of another athletic field, a large athletic building, open space, and parking lots. These uses share common design elements and characteristics of scale and mass, such as large open spaces, areas dedicated to the playing of sports, and places where spectators may stand or sit to watch games. We conclude, therefore, that the Project does not violate CDO § 6.0.1(f).

We now take up the remainder of Mr. Porter's Question 4 along with his Question 5, as they raise related issues. These questions ask, respectively, whether the Project complies with height restrictions in CDO §§ 4.5.2(f)(5) and 5.2.6, and outdoor lighting provisions for athletic fields in CDO § 5.5.2(f)(8).

6

As discussed in our decision on summary judgment motions, light poles for athletic field lights are "structures" to which height restrictions may apply. See In re Univ. of Vt. Certificate of Appropriateness, No. 90-7-12 Vtec, slip op. at 14 (Vt. Super. Ct. Envtl. Div. Feb. 26, 2013) (Walsh, J.). We also concluded that the athletic field light poles proposed for this Project are not subject to the general 35-foot height restriction within Article 5; they are subject to CDO § 4.5.2(f)(5), which imposes a height limit of 62 feet in the area where the Project is located.[3] Id. at 14–15. Because the proposed lighting structures exceed 62 feet in height, they would violate the height limitation of CDO § 4.5.2(f)(5) if we were to read that provision in isolation. UVM and the City argue that provisions in the CDO specific to outdoor athletic facility lighting must be read to allow the light fixtures as proposed. UVM asserts that 62-foot lights would neither provide safe illumination for athletes nor minimize light impacts to neighbors, while the 70 and 80-foot lights proposed would accomplish both mandates. As a result, UVM argues that permitting the lights is consistent with portions of the CDO that designate the area in question for athletic facility uses and expansions.

Our "paramount goal" when construing a statute or regulation is to implement the will of its drafters. Colwell v. Allstate Ins. Co., 2003 VT 5, ¶ 7, 175 Vt. 61 (citing Baker v. State, 170 Vt. 194, 198 (1999); State v. O'Neill, 165 Vt. 270, 275 (1996)). When an ordinance's language is plain and unambiguous, it is our duty to enforce it "according to its terms without resort to statutory construction." Id. (internal citations omitted). However, when "both parties' interpretations are plausible . . . we must ascertain legislative intent through consideration of the entire statute, including its subject matter, effects and consequences, as well as the reason and spirit of the law." In re Estate of Cote, 2004 VT 17, ¶ 10, 176 Vt. 293. We may not construe an ordinance in a way that is at odds with its underlying purpose. In re Jewell, 169 Vt. 604, 606 (1999) (mem.) (citing Mesa Leasing Ltd. v. City of Burlington, 169 Vt. 93, 95 (1999)..

We find the 62-foot height limitation in CDO § 4.5.2(f)(5) ambiguous insofar as it appears to contradict other mandates within the CDO. Therefore, we examine the provision in the context of the CDO as a whole in an attempt to discern the drafters' intent. According to the CDO, the ICC-UVMS overlay is meant

---

[3] A portion of the ICC-UVMS overlay has an additional Height Overlay that allows structures up to 80 feet in height, but the Project is not located within this Height Overlay. See CDO § 4.5.2(f)(5). Also, in our decision on pre-trial motions, we rejected UVM's contention that "actual height" refers to a building's elevation above sea level rather than standard measurements from ground level to a structure's highest point. Nothing presented in the course of the hearing causes us to alter that conclusion.

7

to provide reasonable future use of the UVM residential and athletic campuses south of Main Street without further intrusion into the surrounding residential neighborhoods. This district allows for an increased development scale and intensity than would typically be found in the adjoining and underlying districts to support continued growth and expansion of the state's flagship academic institution. This core campus would be expected to be dominantly pedestrian-oriented, with all but the most essential parking provided off-site. Development within this core campus should reflect the institution's core educational values in both design and quality.

CDO § 4.5.2(b)(4). It is clear that the CDO encourages the development of the athletic campus within the ICC-UVMS overlay. Indeed, the CDO anticipates an increased development scale and intensity in order to support UVM's growth. Although CDO § 4.5.2(f)(5) (entitled "District Specific Regulations: UVM South of Main Street Campus (ICC -UVMS)") limits building height, it does not specifically discuss athletic fields or their lighting needs.

Rather, the regulation of outdoor lighting generally (and outdoor recreation facility lighting specifically), appears instead within CDO Article 5. There, the CDO requires that "[a]ll outdoor lighting shall be designed to provide no more than the minimum lighting necessary to ensure adequate vision and safety for the intended task to be performed in the lighted area." CDO § 5.5.2(e) (emphasis added). The portion of the CDO specific to outdoor lights for recreation facilities begins with the following purpose statement:

There are a variety of outdoor recreation facilities that may be illuminated to allow nighttime use. Examples include tennis courts, ball fields, swimming pools, outdoor skating rinks, and public parks. The regulations in this section are intended to allow illumination of such activities while minimizing adverse impacts such as glare, unwanted illumination of nearby properties and streets, and skyglow.

CDO § 5.5.2(f)(8). It is clear from these provisions that the CDO's lighting regulations are meant to allow an illumination level for outdoor fields that ensures the safety of players and spectators while minimizing impacts to neighbors.

At trial, UVM provided extensive testimony that the Project is crucial to the success of UVM's athletic program and to its ability to garner national recognition and grow its program to attract top athletes and students. UVM athletic department directors testified that UVM would not be a likely candidate for post-season or playoff soccer and lacrosse games without the proposed lighting and seating improvements.

UVM's lighting expert witness credibly testified that the type and brand of lights chosen for the Project are on the cutting edge of lighting design and minimize problems that less

advanced fixtures cause, such as skyglow and light spill. UVM's lighting expert witnesses also credibly testified that 70 and 80-foot high lights would provide effective illumination, without gaps or shadows, and that lower lights, including 60 or 62-foot high lights would fail to provide effective illumination.

According to UVM's credible witnesses, effective illumination is important not only for on-site spectators and television broadcasting, but especially important for the safety of the players on the field, in particular for players of lacrosse, where a small ball flies through the air at high speeds exceeding those of most other sports. While some industry standards suggest minimum lighting levels for lacrosse equal to those necessary for soccer, we regard the expert testimony as to the lighting requirements for the Project as credible.

Appellants did not prove that 60 or 62-foot lights would provide lighting allowing for adequate vision and safety for the purposes of the field. Furthermore, Appellants did not provide credible testimony to suggest that 60 or 62-foot lights would result in less lighting impacts to neighbors.

UVM's lighting experts credibly testified that the lights as designed would minimize glare and light spillage, whereas 60 or 62-foot lights would be aimed at a more horizontal angle, therefore causing <u>more</u> light spillage than taller lights. UVM's experts also credibly testified that there were no alterative locations for lights on the field that would provide adequate illumination and minimize adverse lighting impacts. Appellants did not provide any evidence refuting this testimony.

In sum we find the testimony of UVM witnesses to lead to the conclusion that a 62-foot height limitation, if applicable to the Project, would result in potentially unsafe lighting, would not minimize impacts to neighbors, and would not support UVM's growth and expansion.

Based on our factual findings, we reach the legal conclusion that this result would be demonstrably at odds with the CDO's clear goals of encouraging the development of UVM's athletic campus and ensuring that recreational facility lighting allows for the safety of players and spectators while minimizing impacts to neighbors. Thus, in reading CDO § 4.5.2(f)(5) in the context of the CDO as a whole and in conjunction with the language of the lighting-related provisions of CDO § 5.5.2, we conclude that the height of the light poles as proposed is acceptable under the CDO despite the 62-foot height limitation otherwise applicable to structures in the area where the Project is located.

We further clarify that this decision does not alter our prior conclusion that light poles, including those for athletic lighting, are "structures" that may be subject to height limitations under the CDO. See In re Univ. of Vt. Certificate of Appropriateness, No. 90-7-12 Vtec, slip op. at 14 (Vt. Super. Ct. Envtl. Div. Feb. 26, 2013) (Walsh, J.). Our decision today does not authorize the installation of light poles that exceed height limitations in every case where doing so would assist in minimizing the intrusiveness of the light emitted, nor does it suggest that other kinds of structures on UVM's various campuses can exceed height limitations if those structures relate to the district-specific goals enumerated in the CDO. Rather, this decision addresses the very narrow problem of a zoning ordinance that encourages the development of the athletic facilities of Vermont's flagship institute of higher learning while simultaneously posing height restrictions that, if applied literally, would provide only inadequate and unsafe illumination for playing fields while failing to minimize lighting impacts on neighbors.

We therefore conclude that the proposed lights do not violate the building height restrictions in CDO §§ 4.5.2(f)(5), 5.2.6, and 6.0.1(f), (j), (k), (l), and (n). We also conclude that the proposed lights comply with CDO § 5.5.2(f)(8)—Outdoor Recreational Facility Lighting.

## II. The Project does not violate applicable nuisance regulations for non-UVM related activities at the Project in accordance with CDO § 5.5.1.

CDO Article 5 requires all zoning permit applications to "demonstrate compliance with the applicable nuisance regulations and performance standards" of the Burlington Code of Ordinances. CDO § 5.5.1. The Burlington Code of Ordinances includes a Noise Control Ordinance. The Burlington Code of Ordinances, however, specifically exempts "[m]usical, recreational and athletic events conducted by and on the site of a school or educational institution" from its provisions. City of Burlington Noise Control Ordinance § 21-13(c)(4). Thus, although review of a permitted use may often include noise considerations, this particular project is not subject to review of potential noise impacts. We rendered this conclusion in our February 26, 2013 Decision with respect to Mr. Porter's Question 7, which asks whether the Project complies with CDO § 5.5.1 regarding nuisance regulations.[4]

The present question asks whether 'non-UVM' related activities at the Project site would comply with CDO § 5.5.1. As the application under review is for modifications to an existing athletic field, with no change of use proposed, we conclude that review of "non-UVM" related

---

[4] No party asserted any factors, other than noise, which may generate a potential nuisance.

activities is not properly before the Court. UVM is not seeking approval of non-UVM sanctioned activities at the athletic field, and thus, this question is beyond the scope of our review. We therefore **DISMISS** Mr. Porter's Question 8.

**III.** **The City of Burlington and University of Vermont Memorandum of Agreement Re: 2009 Zoning Amendments is beyond the scope of our review.**

Question 10 of Mr. Porter's Revised Statement of Questions asks whether the proposed project complies with a Memorandum of Agreement between the City and UVM relating to zoning amendments from 2009 (2009 MOA). The central purpose of the 2009 MOA was to increase on-campus student housing. See UVM's Exhibit Q at 1. Although it was uncontroverted at trial that UVM is in compliance with the 2009 MOA, UVM and the City assert that the present application relating to Virtue Field is not subject to the 2009 MOA.

We agree and conclude that the 2009 MOA is not within the scope of review in this appeal, as neither the 2009 MOA nor the CDO requires that the present application be subject to or reviewed for compliance with the 2009 MOA. The 2009 MOA itself does not apply to the proposed project. Further, review of the proposed project under the CDO does not include the 2009 MOA. For these reasons, we **DISMISS** Question 10 in Mr. Porter's Revised Statement of Questions.

**IV.** **The project meets the standards identified in CDO § 6.2.2; specifically traffic, circulation, pedestrian access, and impact study requirements pursuant to § 6.2.2(i), (j), (k), (l), (o), and (p).**

Mr. Porter and the interested parties in this case submitted little evidence regarding traffic, circulation, pedestrian access, or impact study requirements. UVM's evidentiary submissions included the University's Joint Institutional Parking Management Plan 2009-2014, and the Plan's 2012 and 2013 Annual Updates. In reliance on the credible evidence submitted at trial, this Court reaches the following legal conclusions regarding Mr. Porter's challenge to the Project's compliance with portions of CDO § 6.2.2, which pertains to site plan design standards.

CDO § 6.2.2(i), entitled "Vehicular Access," regulates curb cuts, secondary access points, and the dimensions of residential and commercial driveways. As the Project proposes no parking lots or other features that could require curb cuts, access points, or driveways, we conclude that the CDO § 6.2.2(i) is inapplicable to the Project.

CDO § 6.2.2(l) regulates the dimensions and layout of parking areas. The Project does not propose any new parking facilities, and thus CDO § 6.2.2(l) is inapplicable to the Project.

11

Although this Project will increase the number of bleacher seats and therefore potentially increase parking demand during events at Virtue Field, CDO § 6.2.2(l) does not regulate parking volume.

Even, however, taking into account the additional parking demand that the Project may generate, we do not discern any way that the Project would violate CDO § 6.2.2(l). The project will use existing parking lots that have already been approved under the CDO, including the Gutterson Garage or parking lots across Main Street near Jeffords Hall and Given. At times of high spectator volume, shuttles will transport spectators from the remote lots to Virtue Field. Vehicles parking near Virtue Field will enter the UVM campus from Spear Street. Depending on their parking location, those vehicles will exit the UVM campus onto either Spear Street or Main Street.

UVM has sufficient excess capacity as shown by the University's Joint Institutional Parking Management Plan 2009-2014, and the Plan's 2012 and 2013 Annual Updates, demonstrating that 1,195 excess spaces existed in 2008 and 1,290 excess spaces are projected for 2014. Thus, even given the additional parking demand that the Project will generate, such demand will not implicate parking areas outside of approved parking areas already in existence.

CDO § 6.2.2(j) regulates pedestrian access and requires well-defined, direct, and unobstructed pedestrian paths. Pedestrian paths to Virtue Field and the bleachers will have new walkways connecting to the campus-wide walkway network. This network includes pedestrian pick up and drop off points for UVM's campus bus and shuttle system. As we find these paths to be well-defined, direct, unobstructed, and otherwise sufficient, we conclude that the Project complies with CDO § 6.2.2(j).

CDO § 6.2.2(k) regulates accessibility for the handicapped. The Project access ways are designed to be handicapped accessible, and no evidence at trial suggested otherwise. We therefore find the Project to be compliant with this section.

CDO § 6.2.2(o) regulates outdoor lighting and refers to CDO § 5.5.2, which is addressed in detail earlier in this decision. We find that the project complies with CDO § 6.2.2(o).

CDO § 6.2.2(p) governs infrastructure features such as exterior storage areas, machinery and equipment installations, service and loading areas, utility meters and structures, mailboxes, and similar accessory structures, requiring that designers minimize the visual and auditory

impacts of such features. UVM proposes to install utilities underground, and the Project includes no new ground mounted mechanical equipment. The Project is designed to mitigate visual and audible impacts; for example, the type and height of the lighting fixtures (as explained above) minimizes light spill and skyglow. We therefore determine that the Project complies with CDO § 6.2.2(p).

## V. The project does not intrude into surrounding residential neighborhoods and therefore complies with CDO §§ 4.5.2(b)(4) and 6.0.1(f).

CDO § 4.5.2 pertains to the City's Institutional Core Campus Overlay Districts. Subsection (b)(4) establishes the UVM South of Main Street Campus (ICC-UVMS). The ICC-UVMS "is intended to provide reasonable future use of the UVM residential and athletic campuses south of Main Street without further intrusion into surrounding residential neighborhoods." CDO 4.5.2(b)(4). The ICC-UVMS "allows for an increased development scale and intensity than would typically be found in the adjoining and underlying districts to support continued growth and expansion of the state's flagship academic institution." Id.

CDO § 6.0.1 sets citywide development principles to further the City's vision for a dynamic, vibrant, sustainable city amidst a scenic, natural setting. Subsection (f) requires that development "[c]omplement Burlington's architectural and cultural heritage by conserving and/or reflecting dominant design elements and characteristics of neighborhoods, and maintaining neighborhood proportions of scale and mass." CDO § 6.0.1(f).

UVM's proposal entails further development of an existing athletic field within the existing central athletic complex of the UVM campus. The Project is not proposed in a new, previously unused area of campus, nor is the project "pushing" athletic use into a historically residential neighborhood. Furthermore, the Project is designed to utilize existing access ways and parking facilities. Lastly, the Project is designed to have minimal, if any, impacts to surrounding neighborhoods and property owners. For instance, the Project's lighting design results in no light spill into neighborhoods and minimizes skyglow.

At trial, Mr. Porter asserted that Project's lighting will intrude upon his residence unless existing trees growing between his property and the project are retained and maintained. Some of these trees are on UVM property, some are on Mr. Porter's property, and many are on an adjoining third property. We conclude that the project does not intrude into surrounding residential neighborhoods, and we do not condition this conclusion on any requirement that existing trees be maintained.

13

## Conclusion

For the reasons discussed above, we render the following conclusions:

1. The proposed lights do not violate the building height restrictions in CDO §§ 4.5.2(f)(5) and 5.2.6, and §§ 6.0.1(f), (j), (k), (l), and (n) and that the lights comply with § 5.5.2(f)(8)–Outdoor Recreational Facility Lighting.

2. The Project does not violate applicable nuisance regulations for non-UVM related activities at the project in accordance with CDO § 5.5.1.

3. The Project does not implicate the City of Burlington and University of Vermont Memorandum of Agreement RE: 2009 Zoning Amendments.

4. The Project meets the standards identified in CDO § 6.2.2; specifically traffic, circulation, pedestrian access, and impact study requirements pursuant to CDO §§ 6.2.2(i), (j), (k), (l), (o), and (p).

5. The Project does not intrude into surrounding residential neighborhoods and therefore is not in violation of CDO §§ 4.5.2(b)(4) and 6.0.1(f).

Accordingly, we **AFFIRM** the City of Burlington's DRB Decision and Permit, including all conditions of approval.

A Judgment Order accompanies this Decision. This completes the current proceedings before this Court.

Done at Burlington, Vermont, this 8th day of July, 2013.

_____

Thomas G. Walsh, Environmental Judge