STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT | ENVIRONMENTAL DIVISION |
| Vermont Unit | Docket No. 163-11-12 Vtec |

| | |
|---|---|
| Hinesburg Hannaford SP Approval | DECISION ON THE MERITS |

Before the Court is an appeal of a site plan application by Martin's Foods of South Burlington (Applicant) for the construction of a 36,000-square-foot Hannaford grocery store and 128-space parking lot (the Project) on Lot 15 of the Commerce Park subdivision in Hinesburg, Vermont. A group of Hinesburg residents[1] (Appellants) oppose the Project and have appealed the Town of Hinesburg Development Review Board's (DRB) approval of the site plan application. Applicant has also cross-appealed the DRB's decision, challenging certain conditions the DRB imposed as part of its approval. Additional interested parties in this matter include the Agency of Natural Resources (ANR), the Natural Resources Board (NRB), the Town of Hinesburg (Town), and Mr. Gill Coates.

Prior to trial there were several other self-represented litigants that were named parties in this appeal. These self-represented litigants failed to appear or participate at trial. It is incumbent upon a litigant to efficiently prosecute their position in litigation. See V.R.C.P. 41(b)(2) (allowing for a motion to dismiss for failure to prosecute or comply with procedural rules or orders of a court). It is within the Court's inherent powers to dismiss a party where that party fails to prosecute or otherwise put on their case. See In re Appeal of James D. Sparkman, No. 183-11-97 Vtec, slip op. at 4 (Vt. Envtl. Ct. Mar. 29, 2000) (Wright, J.). "Trials are set for the purpose of bringing a case to conclusion, not as optional events that parties may decide to be prepared for or not as they choose." Rab Performance Recoveries v. Swanson, No. S2171-09 CnSc, slip op. at 3 (Vt. Super. Ct. May 12, 2010) (Toor, J.).

During the March 16, 2015 pre-trial status conference, the Court established a deadline for parties to file dates of unavailability for a five-day trial in October, November, and

---

[1] These individuals are Mary Beth Bowman, Judith Chafee, Geoffrey Gevalt, Catherine Goldsmith, Jean Kiedaisch, Richard Palieri, Sally and Chuck Reiss, Heidi Simkins, Stephanie Spencer, Art Weis, and Claire Weis.

December 2015. Several self-represented litigants asked questions about the process for setting trial and what would happen if they were not available on the trial dates. The Court explained that it works diligently to schedule trials when parties are available; however, in matters with large numbers of parties, the Court cannot accommodate all schedules. The Court further explained that it makes reasonable accommodations when parties need to miss portions of multi-day trials. On May 13, 2015, the Court issued notice setting this matter for five days of trial on November 30 through December 4, 2015. The parties therefore had plenty of advance notice to adjust their schedules to be available to participate in trial.

Further, during the opening remarks of the first day of trial on November 30, 2015, the Court warned parties about the possibility of being dismissed from the action, stating, "[I]f a self-represented litigant or, for that matter, any litigant doesn't participate, either through themselves or through an attorney, I will be dismissing them from the matters." The following self-represented litigants did not appear or participate in any of the three days of trial and are therefore **DISMISSED**: Bill Moller, James Collins, Anita Collins, Charles Kogge, David Lyman, Barbara Lyman, Russell Spies, Janice Osgood, John Lyman, Robert Farley, Elly Coates, and Kim Coates.[2]

In anticipation of trial, pre-filed testimony was submitted by all participating parties except the Town and Mr. Coates. The Town and Mr. Coates did not pre-file testimony; however, they did offer testimony and evidence during trial. The Court conducted a site visit on the morning of November 30, 2015. A merits hearing at the Environmental Division in Burlington followed the site visit and continued through December 2, 2015. At trial, Applicant was represented by Christopher D. Roy, Esq.; Appellants were represented by James A. Dumont, Esq.; the Town was represented by Ernest M. Allen, III, Esq.; ANR was represented by Leslie Welts, Esq. and Jennifer S. Duggan, Esq.; and the NRB was represented by Peter J. Gill, Esq. Mr. Gill B. Coates appeared self-represented.

Upon the close of Applicant's case, Appellants moved for entry of judgment under V.R.C.P. 52(c).[3] We deferred ruling on the motion at trial. We address the motion in this decision where appropriate.

---

[2] The Court will assign each of these dismissed individuals "FYI" status, and as such, each will receive copies of any decision or notice that the Court issues in this matter.

[3] Appellants' motion was made orally and in writing.

Based upon the evidence presented at trial, which was put into context by the site visit, the Court renders the following findings of fact and conclusions of law.

## Findings of Fact

1.      Martin's Foods of South Burlington, LLC proposes to construct a 36,000-square-foot Hannaford grocery store and pharmacy with an associated 128-space parking lot on Lot 15 of the Commerce Park subdivision in the Town of Hinesburg, Vermont (the Project).

2.      Applicant initially applied for site plan and conditional use approval on November 11, 2010, and the proposal was deemed complete on November 18, 2010.  The Hinesburg Development Review Board (DRB) reviewed the application a total of 13 times from January 2011 through July 2012.  The public hearing closed on July 17, 2012.

3.      On August 29, 2012, the DRB provided notice to the public and Applicant that the hearing would be reopened.  The hearing was reopened on September 8 and continued to October 2, 2012.  The public hearing finally closed on October 2, 2012.

4.      The DRB approved the application with conditions by written decision dated November 6, 2012.

5.      Appellants timely appealed that approval to this Court, and Applicant cross-appealed. That appeal was given Docket Number 163-11-12 Vtec (Hannaford Site Plan Appeal).

6.      The parties agree that the Hannaford Site Plan Appeal is subject to the Town of Hinesburg Zoning Regulations adopted on October 12, 2009 (2009 Regulations), submitted as Town Ex. 1b; the Town Plan adopted on June 13, 2005 (2005 Town Plan), submitted as Town Ex. 3a; and the Hinesburg Official Zoning Map adopted on May 4, 2009 (Town Map), submitted as Town Ex. 4.

7.      Lot 15 is one of fifteen lots in the Commerce Park subdivision.  The subdivision is north of the Hinesburg Village center and is generally located in the triangle formed by Route 116, Patrick Brook, which parallels Commerce Street to its north, and Mechanicsville Road.

8.      Route 116 is the main thoroughfare through Hinesburg and runs in a north-south direction.

9.      Mechanicsville Road intersects with Route 116 south of the subdivision and extends northeast eventually joining with CVU Road to the northeast of the subdivision.

10.     Commerce Street is a short east-west connector between Route 116 and Mechanicsville Road that runs through Commerce Park, just north of Lot 15. Commerce Street forms the hypotenuse of the triangle created by the three streets.

11.     Lot 15 is located in the Commercial Zoning District within the Hinesburg Village Growth Area.

12.     The Project is a permitted use in the Commercial Zoning District, subject to site plan review.

13.     There are no historic sites or rare or irreplaceable natural areas at the Project site or in the surrounding area.

14.     On Lot 15, Applicant proposes to construct a 36,000-square-foot Hannaford grocery store with an associated 128-space parking lot. A small portion of land from the adjacent Automotion lot will be acquired to accommodate a public farmers market. Applicant will bring in fill to raise Lot 15 and the farmers market by several feet, requiring regrading and several retaining walls. As part of the Project, Applicant will install a stormwater system to contain runoff from the lot and to treat any pollutants in the stormwater. Applicant will provide significant landscaping and plantings to screen views of the building and parking lot.

15.     Applicant's stormwater system will treat the majority of pollutants in all stormwater runoff from the Project and will collect and detain stormwater runoff from the majority of storms.

16.     During most rain storms, the stormwater system will improve drainage and reduce flooding. Even in extreme storms, post-development flooding will be no worse than what currently occurs in an equivalent storm.

17.     Access to the Project will share the existing curb cut and access drive for the National Bank of Middlebury (Lot 13) on the south side of Commerce Street (Commerce Street Extension). Commerce Street Extension is located between Lots 12 and 13 of the Commerce Park subdivision.

18.     The exterior of the proposed store was designed specifically for this location and is not a standard design used by Hannaford.

19.     The proposed 36,000-square-foot building is a single story with a flat roof. In order to give the appearance of two stories, a wrap-around canopy extends from the side of the building

4

about nine feet off the ground, and windows are located above the canopy to provide the appearance of a second story and allow natural light into the shopping area.

20. The flat roof of the building is wrapped with a faux mansard roof in order to create the appearance of a pitched roof and to conceal the HVAC units, while maintaining flat roof space for solar panels.

21. The building height is 27 feet (the maximum permitted height is 35 feet).

22. The building materials are predominantly masonry and clapboard, and the building colors will be red, brown, and dark green.

23. A covered walkway extends along three sides of the building and will connect with the town sidewalk system.

24. The building is rectangular. The longer façade of the building is 255 feet. The shorter is 188 feet.

25. Though the Hannaford will have the largest footprint of any building in the Commerce Park subdivision, several buildings in the development have sides that are longer than 255 feet (the longest side of the Hannaford), and the Hannaford will be offset so the full length of any one side will not parallel a roadway.

26. Project parking is located to the north and east of the proposed building and will include 128 parking spaces.

27. The parking lot is laid out to allow a circular movement pattern for vehicles.

28. A designated pedestrian path allows access from Commerce Street and Mechanicsville Road to the store.

29. Truck delivery and loading facilities are located on the southwestern facing side of the building, on the opposite side from the store entrance. Delivery trucks will not need to pass in front of the store entrance in order to enter or exit the lot.

30. Non-recyclables will be disposed of in a 35-cubic-yard trash compactor located next to the loading docks on the west side of the building.

31. Snow storage during the winter months will be provided in two designated areas; the .32-acre farmers market parcel on the northwestern side of the lot, and the northeastern portion of the larger parking area.

32. The parking lot is designed with short drive aisles and standard traffic signs. The parking area has no through routes to streets in Hinesburg.

33. The proposed store is an infill project. All lots immediately adjacent to Lot 15 and within the Commerce Park subdivision are already developed. The majority of these lots are the site of commercial businesses with no consistent architectural theme or style.

34. To the west of Lot 15, outside of the Commerce Park subdivision, is the Automotion lot; the lot contains a metal Quonset hut and operates as an auto repair facility.

35. To the south of the Automotion lot is the Giroux Auto Salvage lot (Giroux lot). To the west of the Giroux lot, still on the east side of Route 116, is a commercial auto sales operation.

36. Bordering Lot 15 on its northwestern corner is the two-story flat-roofed Dark Star Lighting building (Lot 11 of the Commerce Park subdivision).

37. To the east of Commerce Street Extension and just south of Commerce Street, is the National Bank of Middlebury. To the east of the bank are a community health facility and a post office.

38. Within the subdivision on the north side of Commerce Street are: A Mobil gas station; Tailhook Towing—a towing operation with a red multiple-bay garage; several metal-roofed long rectangular buildings that are part of a self-storage business; a one-story off-white building housing Minuteman Press; an animal hospital housed in a red pitched-roof single-story building; and the flat-roofed brown and gray Nestech building.

39. Northwest of Lot 15, just southeast of the Route 116/Commerce Street intersection, is the Aubuchon lot (Firehouse Plaza), where a small strip-mall-type shopping plaza contains an Aubuchon Hardware store and several other commercial businesses.

40. Nearby, although not part of the Commerce Park subdivision, is the 76,000-square-foot NRG building and the 86,000-square-foot former Saputo Cheese Plant.

41. A manmade canal extends along the southeastern border of Lot 15, on the northern side of Mechanicsville Road. The canal begins in the northeast corner of the Commerce Park subdivision and diverts a portion of Patrick Brook.

42. In the mid-1990s, Hinesburg received over $100,000 from federal and state authorities for the Hinesburg Streetscape Project to improve sidewalk infrastructure and to construct a paved walkway along the canal (the canal path) as well as to install a footbridge (the Pony Truss Bridge).

6

43.     The canal path parallels the canal to the north and traverses the southeastern edge of Lot 15.  The Town obtained a 20-foot-wide easement in 1996 on Lot 15 for the construction and maintenance of the canal path.

44.     In the southwestern corner of Lot 15, the canal path crosses the Pony Truss Bridge and joins Mechanicsville Road on the south side of the canal.  A small "pocket park" is proposed for the area immediately north of the footbridge.

45.     At their closest points, the edge of the building will be about 65 feet from the canal and the overhang of the roof will measure about 42 feet from the edge of the canal.

46.     One lot within the subdivision is permitted for development within 50 feet from Patrick Brook.  At least two other lots in the subdivision are permitted to develop within 75 feet of Patrick Brook.

47.     Landscaping is provided around and within the Project site for aesthetics, shading, and screening.

48.     Applicant will spend over $109,705 on landscaping for the Project.

49.     The landscaping breaks up the open parking lot, screens views of the main parking lot and building from Mechanicsville Road, and screens views of the Project site from Vermont Route 116.

50.     There are six landscaped islands in the two parking areas, which include a mix of trees and shrubs.

51.     Landscaping for the Project includes (feet at maturity):
    a.      40 red maple trees (40-60)
    b.      17 serviceberry trees (15-25)
    c.      7 sugar maple trees (40-50)
    d.      4 Sargent crabapple trees (15-20)
    e.      18 greenspire linden trees (60-70)
    f.      52 white spruce trees (40-60)
    g.      11 Princeton American elm trees (50-60)
    h.      44 redosier dogwood shrubs
    i.      385 rugosa rose shrubs
    j.      55 Anthony Waterer spirea shrubs
    k.      24 Japanese spirea

7

l.    20 dark American arborvitae

m.    1,135 daylilies

52.    A majority of the landscaping is located along the property boundaries and on the outside perimeter of the parking areas.

53.    Landscaping west of the building is located in an easement area benefiting Lot 15 on the east side of the Giroux lot.

54.    Substantial landscape plantings are proposed to the south of the building between the canal and the building.  Over $28,000 of the landscaping budget is allocated for the canal path and pocket park.

55.    Many of the lots in the Commerce Park subdivision have little landscaping and are prominently visible from Commerce Street and parts of Route 116.

56.    Lighting for the parking area consists of LED fixtures on 20 foot high light poles. The lights are fully shielded. Fully shielded light fixtures reduce glare and light pollution.

57.    There will be a total of thirteen 20-foot high light poles with a single light fixture and four 20-foot high poles with double fixtures. Three of the single fixture poles will be located along Commerce Street Extension.

58.    The building is primarily lit by recessed canopy LED lights that are located along the eastern and northern sides of the building at a height of nine feet. These building lights are also fully shielded.

59.    The loading area is lit by two fully shielded wide throw sconce LED lights.

60.    A flag pole in the main parking area will have a down-casting light fixture to illuminate the flag.

61.    All exterior lights will be turned off one hour after the store closes except for four fixtures (a total of six lights) that are necessary for security.

62.    Due to the shielding, light levels are at or near zero foot-candles (a unit of measure of light intensity) at the property line.

63.    The current grade of the site is between 337 feet above sea level and 346 feet above sea level.  Applicant will deposit fill to bring the grade up to 342–344 feet above sea level with the finish floor of the store at 345 feet above sea level.  This is about the same elevation as the post office and National Bank of Middlebury.

64.    Mechanicsville Road is at an elevation of 350 feet.

8

65.     To accommodate a farmers market on Lot 15, Applicant will acquire .32-acre parcel of land from the east side of the adjacent Automotion lot, and will raise the site by several feet to create a flat grassy area.  It is necessary for Applicant to receive site plan and subdivision approvals for the acquisition.

66.     The Automotion lot is in the Village Zoning District.

67.     Farmers markets are permitted uses in the Village Zoning District.

68.     During the winter months when the farmers market is not in use, the area is proposed for snow storage.  Snow melt from this area will drain into Applicant's stormwater system.

69.     Because of the raised grade of the Project site, Applicant will install several retaining walls.  One will be located along the northwestern boundary with the Dark Star lot, and a second along the western boundary with the Giroux lot just south of the farmers market area. Two other shorter walls will be placed on either side of the Commerce Street Extension as it opens into the Hannaford parking area.

70.     The retaining walls will be constructed with concrete blocks and will be three to five feet in height.  The two longer walls will be about 100 feet long.

71.     As part of its site plan application for Lot 15, Applicant is required to obtain site plan amendments for two existing developments on related parcels within or adjacent to the Commerce Park subdivision (Automotion and Aubuchon lots), as well as amendments to the 1987 Commerce Park and 1987 Giroux Building Supply subdivision permits.

## **Conclusions of Law**

In this matter, the parties' statements of questions define the scope of our review.  In re Garen, 174 Vt. 151, 156 (2002) ("An appeal to the environmental court is confined to the issues raised in the statement of questions filed pursuant to an original notice of appeal.").  Appellants raise seven questions in their Statement of Questions.  Applicant cross-appealed with a ten-question Statement of Questions.  We turn first to the issues raised by Applicant.

I.     Applicant's Challenges to the Regulations and DRB's Authority

We answered many of Applicant's questions pre-trial.  We briefly summarize our holdings in those decisions.  Two of Applicant's questions challenge the constitutionality and enforceability of the 2009 Regulations (Questions 2 and 4).  We substantially addressed these challenges in our March 4, 2015 Decision on Multiple Pre-Trial Motions, where we explained

that Section 4.3.2 and 4.3.4 of the 2009 Regulations provided sufficiently clear standards and are therefore constitutional and will be enforced.  See Hinesburg Hannaford CU Approval, Nos. 129-9-12, 163-11-12, 68-5-14, 69-5-14, and 70-5-14 Vtec, slip op. at 7–10 (Vt. Super. Ct. Envtl. Div. Mar. 4, 2015) (March 4, 2015 Decision).  Therefore, for the reasons stated in our March 4, 2015 Decision, Applicant's Questions 2 and 4 are answered with the conclusion that Section 4.3.2 and 4.3.4 of the 2009 Regulations are plainly constitutional and enforceable.  Applicant also challenges the ability of the DRB and this Court to condition site plan approval on conditions not explicitly described in the regulations (Questions 3, 5, 6, 7, 8, 9, and 10).  Initially, we note that our trial is a de novo review, so to the extent Applicant is challenging what was done below, the questions are largely irrelevant to this proceeding.  Furthermore, as we also explained in the March 4, 2015 Decision, there is clear authority under the enabling legislation, 24 V.S.A. § 4416, and the 2009 Regulations for this Court to impose reasonable conditions.  See March 4, 2015 Decision at 14.  We therefore answer Applicant's Questions 3, 5, 6, 7, 8, 9, and 10 with the conclusion that because the Regulations provide sufficient standards to review the application, we may impose reasonable conditions to ensure compliance with those standards.

Only Question 1 of Applicant's Statement of Questions remains for our review. Applicant's Question 1 asks, "Can project approval be conditioned on the 2009 Town Map given its vagueness and overbreadth with reference to the definition of community facility and its prescribed location on some or all of the subject parcel?" Applicant's Statement of Questions (SOQ) at 1, filed on Dec. 24, 2012.  Applicant appears to argue that the Project cannot be denied on the basis of the location of its proposed farmers market, since the Town Map is impermissibly vague.  As discussed more fully in our response to Appellants' Questions 3, 4, and 5, see Part II(B) infra, the proposed Project accommodates the community facility depicted on the Town Map by providing space for a farmers market.  We therefore find Applicant's Question 1 is moot and we will not address it further.

II.     Appellants' Opposition to the Project

We interpret Appellants' Statement of Questions to challenge the Hannaford Site Plan Appeal on four issues.  First, Appellants claim that the procedure and staggered review of the various permits necessary for the Project is improper.  Second, Appellants claim that the Project does not accommodate the mapped public facility on Lot 15 as required by 24 V.S.A. § 4421. Third, Appellants question whether the Project complies with the site plan standards under the

10

2009 Regulations. Fourth, Appellants argue that the Project is barred because it violates critical conditions of the 1987 Commerce Park subdivision permit, and Applicant has not sought a permit amendment. We address these questions in order, and refer to our prior decisions in this matter where we have substantially and substantively answered the same or similar questions.

a.    Procedural Challenges

Appellants' Questions 1 and 2 challenge the procedure of Applicant's permitting process, claiming it was improper to submit the Hannaford site plan when additional permits necessary for the completion of the entire Project were not noticed and had not yet been reviewed. As we discussed in our March 4, 2015 Decision, there is nothing improper with a development review board or this Court considering an application for site plan approval when other project permits had not yet been noticed or reviewed. See March 4, 2015 Decision at 15–16. Nowhere does Chapter 117 of Title 24, or any other law Appellants have pointed us to, require that all related permits be addressed at one time. Stated another way, the consideration of a properly noticed permit application does not require all other necessary permits be noticed or pending at the same time. Each permit application constitutes a distinct issue proper for this Court's review. While the ultimate success of the Project may depend on Applicant receiving all necessary permits, that in no way impacts the ability of this Court to review a distinct matter. We therefore answer Appellants' Questions 1 and 2, concluding that it was and is lawful and constitutional for the DRB and for this Court to review the site plan application for the Project.

b.    Does the Project Accommodate Mapped Community Facilities (Questions 3, 4, and 5)?

Appellants next challenge the site plan approval by claiming the Project does not satisfy 24 V.S.A. § 4421 because it does not adequately accommodate a mapped community facility.[4] Primarily, Appellants argue that Applicant cannot satisfy 24 V.S.A § 4421 by using lands outside

---

[4] We note that while the statue uses the phrase "public facility" the Town Map uses the phrase "community facility." We find these terms synonymous, and will use "community facility" to comport with the Town Map.

of Lot 15 that lie within a more restrictive zoning district[5] and that are not subject to the current site plan application.

Section 4421(5) provides in relevant part, "Any application for . . . development review that involves property on which the official map shows a public facility shall demonstrate that the mapped public facility will be accommodated by the proposed . . . development." 24 V.S.A. § 4421(5). Here, the Town Map identifies several potential community facilities for Lot 15, one of which is a farmers market. The Town Map provides no indication that any one facility is required, but rather only establishes that Lot 15 is a potential lot for one of the listed community facilities.

To accommodate this requirement, Applicant proposes to reconfigure Lot 15 by adding .32 acres from an adjacent lot and putting a farmers market on the reconfigured Lot 15. Appellants argue that because the .32 acres that will accommodate the farmers market was not originally part of Lot 15, Applicant cannot satisfy Section 4421. Appellants provide no further explanation for why the transfer and use of the .32-acre parcel is impermissible and we find no merit to this argument. As proposed, Lot 15 will accommodate a farmers market. The fact that a subdivision revision permit is needed to adjust the lot lines to incorporate the .32 acres into Lot 15 has no bearing on whether the Project will accommodate a mapped community facility. There is nothing explicit in the Statue or Regulations that prevents reconfiguration of lot boundaries to carry out the goals of Section 4421. Indeed, were such a rigid interpretation of Section 4421(5) to be employed, valuable opportunities to expand community facilities would be compromised. Furthermore, the fact that the .32-acre parcel is in the Village Zoning District, while the zoning district for remainder of Lot 15—the Commercial District—permits uses that would require conditional use approval if they were to occur on the .32-acre parcel, does not prohibit the transfer of the .32 acre parcel to Lot 15 or the parcel's proposed use as a community facility. After the .32 acres is transferred to Lot 15, the .32 acres will be used for a farmers market, a permitted use in the Village Zoning District. See In re Bove Demolition/Const. Application, 2015 VT 123, ¶ 13 (permissible for zoning district to split single lot). We therefore answer Appellants' Questions 3, 4, and 5 by concluding that the Project satisfies 24 V.S.A. § 4421 in adequately accommodating a mapped community facility.

---

[5] The Automotion and Giroux lots are in the Village Zoning District. Farmers markets are a permitted use in the Village Zoning District.

c.      Does the Project Comply with Site Plan Review Standards?

Appellants' Question 6 asks, "Can applicant satisfy all of the standards of the Hinesburg site plan review ordinance, including but not limited to compatibility with the adjacent property and the character of the neighborhood, setbacks, traffic and pedestrian safety, adequacy of stormwater runoff and design for poorly drained areas, and consistency with the Town Plan?" Appellants' Statement of Questions (SOQ) at 3, filed Dec. 3, 2012.  While Appellants' qualify their question with "including but not limited to," we only consider those provisions of the 2009 Regulations specifically raised.   See Reporter's Notes, V.R.E.C.P. 5(f) ("The statement [of questions] functions like a pleading to limit the issues that are to be heard on the appeal . . . ."); In re Garen, 174 Vt. 151, 156 (2002) ("An appeal to the environmental court is confined to the issues raised in the statement of questions filed pursuant to an original notice of appeal.").  At this Court's request, Appellants clarified that Question 6 only raises issues with Sections 4.3.4(1)–(4) and (6)–(9) of the 2009 Zoning Regulations.

Under Section 4.3.4, the tribunal reviewing a site plan application "shall take into consideration the following standards:"

1.  Safety of vehicular and pedestrian circulation on site and on the adjacent street network;

2.   Adequacy of circulation, parking and loading facilities with particular attention to safety.  Provisions for refuse storage and disposal, snow removal, and emergency access shall also be addressed where applicable.

3.  Adequacy of landscaping, screening, setbacks, hours of operation and exterior building design in regard to achieving maximum compatibility with adjacent property and with the character of the neighborhood.

4.  Adequacy of exterior lighting for safe circulation on the site without creating off-site glare and excess illumination.

. . . .

6.  Adequacy of drainage and grading plan, ensuring treatment and control of stormwater runoff, control of soil erosion during and after construction, and proper design solutions for steep slopes and poorly drained areas.

7.  Consistency with the Town Plan in regards to the pattern of development, preservation of significant natural and cultural resources, and the location and nature of existing planned roadways and other public facilities.

8.  Proper planning and design in regard to hazardous wastes and avoidance of runoff.

9.  Conformance with design standards as stated in Sections 3.4.5 and 5.6, where they apply.

13

2009 Regulations § 4.3.4.  We address each provision in order.

The Project fully satisfies Section 4.3.4(1) by incorporating several measures to ensure pedestrian and vehicular safety on site and on the adjacent streets.  The Project incorporates sidewalks throughout Lot 15, providing designated pedestrian routes from the canal path to the store and also to and from Commerce Street.  Applicant will also extend the sidewalk along Commerce Street, providing pedestrian access from Route 116.  The parking lot design encourages vehicles to move slowly, with short drive aisles, no through routes to other streets, and stop signs and other traffic markings.  Additionally, the truck receiving area is on the opposite side of the building from the location of the parking and sidewalks, limiting customer interaction with delivery vehicles.  Lastly, with Applicant's proposed traffic mitigation measures and those we impose under Criterion 5 in the related Act 250 decision, see Hinesburg Hannaford Act 250 Permit Appeal, No. 113-8-14 Vtec, slip op. at 43–48 (Vt. Super. Ct. Envtl. Div. Apr. 12, 2016), vehicular safety on site and on the adjacent street network will be ensured.

Next, based on the site plans provided by Applicant, we conclude that the lot layout will provide adequate parking and ensure fluid circulation and access for customer traffic, deliveries, and any needed emergency services.  The Project provides 128 parking spaces, with a shared access drive with the National Bank of Middlebury off Commerce Street.  The parking lot is laid out to allow a circular movement pattern for vehicles.  A designated pedestrian path allows access from Commerce Street and Mechanicsville Road to the store.  Loading facilities are located away from the store entrance with adequate space so that delivery vehicles will not pass in front of the store entrance.  Non-recyclables will be disposed of in a 35 cubic-yard trash compactor located next to the loading docks on the northwest side of the building.  The .32-acre parcel that will be used as a farmers market will provide a snow storage space in winter, as will the northeastern portion of the parking lot.  We therefore conclude that the Project complies with Section 4.3.4(2).

Section 4.3.4(3) requires this Court to consider the adequacy of landscaping, screening, setbacks, hours of operation, and exterior building design in regard to achieving maximum compatibility with adjacent property and with the character of the neighborhood.  This

14

regulation reviews a project's fit or compatibility with its surroundings.[6] The Project's site plan, including the landscaping and architectural design, does achieve compatibility with the Commerce Park subdivision and the larger Village Growth Area. Applicant will spend over $100,000 on landscaping for the Project. The extensive plantings and landscape designs will soften views of the parking lot and building. Further, Applicant hired a local architectural firm to create a custom store design specifically for this location in Hinesburg, and the design incorporates cues from the neighboring area. Lastly, the building itself does not unreasonably encroach on any other lot or buffer, and, although large, it is not out of character with the commercial surroundings and other buildings in the area.

Appellants, however, read more than a fit component into Section 4.3.4(3), arguing that the proposed retaining walls violate Section 4.3.4(3) because they do not meet setbacks specified in other provisions of the Regulations. We disagree, and conclude that the setback standards of the 2009 Regulations do not prohibit the proposed locations of the retaining walls.

Due to the raised grade of the site, Applicant will install several retaining walls to stabilize the elevated lot. One of these retaining walls is located along the boundary with the Giroux lot, another parallels the boundary with the Dark Star lot, and two shorter walls border the southern end of Commerce Street Extension. These walls will be made of concrete blocks and will be between 3–5 feet in height. One or more of these walls is within 10 feet of a lot boundary.

Under the area and dimensional requirements in Article II of the Regulations, in the Commercial Zoning District, all buildings must maintain a 10-foot setback from property lines or obtain a variance or conditional use approval. 2009 Regulations § 2.4, tbl. 1. Appellants argue that the retaining walls are subject to this setback provision because the Regulation applies to all buildings and structures, and the retaining walls qualify as structures. They also argue that, even if the retaining walls are not "structures," erecting the walls is "land development

___

[6] When considering a municipal "fit" standard that prohibits an adverse effect on the character of the area, we have employed a similar analysis to our Act 250 Criterion 8 Quechee test. See In re Group Five Investments CU Permit, 2014 VT 14, ¶ 14, 195 Vt. 625. Here, Section 4.3.4 only requires that we "take into consideration" the adequacy of the Project's "landscaping, screening, setbacks . . . in regard to achieving maximum compatibility with adjacent property and with the character of the neighborhood." This does not impose the same prohibitory standard of "no undue adverse impact" as under Act 250 Criterion 8. We therefore do not read Section 4.3.4(3) to establish the equivalent binding standard as that under Act 250 Criterion 8; rather, it only asks this Court to consider whether a project is compatible with the surroundings.

activity," which is also subject to the 10-foot setback requirement and thus cannot be located within 10 feet of the lot boundaries, and therefore the site plan application must be denied.

We disagree with this interpretation and, for the following reasons, conclude that the applicable setback provisions of the 2009 Regulations do not prohibit the proposed locations of the retaining walls. When interpreting zoning regulations, we use the familiar rules of statutory construction. In re Appeal of Trahan, 2008 VT 90, ¶ 19, 184 Vt. 262. We will "construe words according to their plain and ordinary meaning, giving effect to the whole and every part of the ordinance." Id. In construing the language of an ordinance, our "paramount goal" is to implement the intent of its drafters. Colwell v. Allstate Ins. Co., 2003 VT 5, ¶ 7, 175 Vt. 61. We will therefore "adopt a construction that implements the ordinance's legislative purpose and, in any event, will apply common sense." In re Laberge Moto-Cross Track, 2011 VT 1, ¶ 8, 189 Vt. 578 (quotations omitted). Further, zoning ordinances are in derogation of property rights; thus any ambiguity should be resolved in favor of the property owner. See In re Weeks, 167 Vt. 551, 555 (1998).

The 2009 Regulations define "setback" as "the nearest distance between a building face and the nearest section of a property line." 2009 Regulations § 10.1. A "building face" is defined as the side or edge of a structure. Id. The term "structure or building" is defined as "anything constructed, erected, or placed and which requires a fixed location on the ground in order to be used, including, but not limited to, a building in excess of 100 square feet, mobile home or trailer, signs, manure lagoons and pits, silos, tennis courts, and swimming pools with an area greater than 100 square feet. Not included are sidewalks, patios, driveways, utility poles, compost bins, steps, planters, fences, or temporary docks or floats." Id. The Regulations do not define or specifically mention retaining walls as an example of structure, nor are retaining walls explicitly excluded from the definition of structure or from setback requirements.

Appellants argue that because a retaining wall is "constructed, erected, or placed" and requires a fixed location, it is a structure for the purpose of setbacks. While a retaining wall is constructed, erected, or placed, we do not read the definition of structure so broadly. The definition specifically provides that a structure is anything "constructed, erected, or placed . . . including, but not limited to, a building in excess of 100 square feet, mobile home or trailer . . . ." Id. If everything that was constructed, erected, or placed, was a structure, there

16

would be no need to provide the "including but not limited to" language. Moreover, the fact that the definition specifically mentions buildings in excess of 100 square feet, suggests that buildings less than 100 square feet are excluded. Even if less than 100 square feet, however, a small building is certainly "constructed, erected, or placed." Further, excluded from the Regulations definition of "structure," are sidewalks, patios, and driveways. Yet, these items are also constructed, erected, or placed and require a fixed location. Therefore, under this definition, the mere fact that something requires construction and a permanent location does not necessarily mean it is a "structure" subject to the 10-foot setback requirement.

We therefore must read the Regulations in their entirety and attempt to read some purpose or intent into those items specifically defined or specifically excluded from the definition of "structure" or "setback." When read as a whole, we interpret the regulations to have only intended to place a specific setback limit on buildings and accessory structures themselves, not on individual site-development features, such as the Lot 15 retaining walls. We find support for our interpretation in those items specifically excluded from the definition of a structure. While stand-alone buildings and recreational facilities are provided as examples of structure, incidental items such as sidewalks, driveways, utility poles, and steps are explicitly excluded. A driveway or sidewalk can require significant effort to construct with large quantities of concrete or pavement. Nevertheless, the drafters of the Regulations determined that such items were in some way fundamentally different than a building or home. Like a sidewalk or a driveway, a retaining wall may be necessary for site development and improvement, but does not on its own provide a purpose or use for the lot. Therefore, we conclude that retaining walls are more like the sidewalks, driveways, utility poles, and fences that are specifically excluded from the definition of structure than they are to buildings, silos, or tennis courts. See 2009 Regulations § 10.1. Furthermore, this interpretation provides some common sense. It is foreseeable that a commercial lot will require site improvements such as retaining walls or drainage ditches, yet nowhere do these items, or similar landscaping and site improvement measures, appear as examples of the type of constructed item the Regulations intended to regulate through the setback requirement.

Appellants also cite Section 2.5.3, which provides, "All land development activity, regardless of building permit requirements . . . is required to meet the setback . . . requirements." Therefore, we also consider whether the construction of the retaining walls on

17

Lot 15 is "land development" under Section 2.5.3. The Regulations define "land development" as, "The Division of a parcel into two or more parcels, the construction, reconstruction, conversion, structural alteration, relocation, or enlargement of any building or other structure, or of any mining, excavation or landfill, or any substantial change in the use of any building or other structure, or land, or extension of use of land." Id. § 10.1. Clearly, the Project is land development in that a building is proposed for construction and a new land use is being introduced. This does not, however, automatically lead to the conclusion that every aspect of the Project is subject to setback requirements.

Appellants' interpretation of Section 2.5.3 would have us dissect each component of land development and apply setback requirements to each discrete aspect. Such a reading does not achieve a practical or common sense outcome. Instead, we consider the land development activity at issue here, i.e. the construction of a 36,000-square-foot structure, and ensure that it complies with setbacks. We do not, however, read Section 2.5.3 to apply to isolated site-development features, such as the retaining walls proposed for Lot 15, that have no significance independent of the Project. Therefore, because we find that retaining walls are not subject to specific setback requirements of the 2009 Regulations, we conclude that the Project complies with Section 4.3.4(3).[7]

Turning next to Section 4.3.4(4), we find that the lighting for the Project provides sufficient lighting for safety while at the same time minimizing undue light pollution. The parking lot is well lit by multiple 20-foot high LED lights. Greeting customers as they walk from their cars, the eastern side of the building, where the store entrance is located, is lit by ten wall mounted LED lights, with another four along the northern side of the building. Balancing the need for adequate on-site lighting with concerns of off-site glare and light pollution, the design incorporates several measures to reduce glare and off-site impacts. In response to concerns raised by the community, Applicant lowered the initially proposed light heights and reduced the

---

[7] We note that the DRB considered the issue of setbacks under Section 4.3.4(3), but did so only considering the adequacy of the setbacks to achieve compatibility with surroundings, i.e., a "fit" review. The DRB did not consider whether the retaining walls must meet the building setbacks laid out in Table 1 of the 2009 Regulations. We question whether Section 4.3.4(3) intends a review beyond consideration of whether the design and setbacks ensure compatibility with adjacent property and the character of the neighborhood—in other words, we question whether the site plan provisions were meant to incorporate strict area and dimensional requirements found elsewhere in the Regulations. To the extent the site plan provisions only require that site plan dimensions ensure compatibility with adjacent properties, we conclude that the retaining walls, as conditioned by the DRB's approval, are compatible with adjacent properties and the commercial area more generally.

wattage of many of the exterior lights. In addition, all lights are fully shielded, thus minimizing light levels beyond the area intended for illumination. Further, all but six lights (four fixtures) will be turned off after hours. These remaining lights are needed to provide some minimal security illumination. Because the lighting plan provides for generous illumination of the exterior of the store and parking area, while also incorporating designs and operational restrictions to reduce glare and off-site impacts, we conclude that the Project complies with Section 4.3.4(4).

The adequacy of Applicant's stormwater measures is the main thrust of Appellants' challenge in both this site plan appeal and in the related Act 250 matter. Sections 4.3.4(6) and 4.3.4(8) both require consideration of the adequacy of the proposed stormwater measures to control runoff, erosion, and drainage.[8] Applicant's stormwater measures, both during construction and operation, are sufficient to satisfy Sections 4.3.4(6) and 4.3.4(8). During construction, Applicant will employ methods approved by ANR to control sediment runoff and erosion. During normal operation, the Project's stormwater system uses a series of catch basins and detention chambers to control the rate of release of stormwater, and incorporates two treatment methods to eliminate pollutants from the stormwater runoff. Flooding and runoff issues will actually improve post-development for most rain events. Even during major storms, the Project will not increase or exacerbate flooding or runoff issues on nearby or adjacent properties. We therefore conclude that the Project meets Sections 4.3.4(6) and (8).[9]

Although compliance with the Town Plan was raised by Appellants, they do not identify any section of the Town Plan that is not accommodated by the Project. Merely raising the issue of compliance with the Town Plan is insufficient to provide a specific challenge to the Project. Based on the testimony and evidence supplied by Applicant, and our own review of the Town Plan, we conclude the Project fully complies with the 2005 Town Plan and thus satisfies Section 4.3.4(7). The Project is located on the last undeveloped lot of a commercial subdivision and is a permitted use in the Commercial Zoning District. The Project will provide space for a farmers market and will include a small park along the canal path. Overall the Project will not

---

[8] Pre-trial, Appellants clarified that they were not raising any issues under the portion of Section 4.3.4(8) concerning hazardous wastes.

[9] Because we find that Applicant presented sufficient evidence to prove compliance with Section 4.3.4(6), we also deny Section 5 of Appellants' Motion for Entry of Judgment.

negatively impact any significant cultural resources and will actually provide additional community space and investment in public areas.

Lastly, Section 4.3.4(9) lists conformance with design standards stated in Sections 3.4.5 and 5.6 as a consideration for site plan review. Section 3.4.5 is not applicable to the Project, and the only required design standard under Section 5.6 applicable to the Project that has not been addressed above[10] is Section 5.6.3—Parking and loading areas. The compatibility with this standard was addressed in our September 16, 2015 Decision on Motions to Strike and Motions for Entry of Judgment. See Hinesburg Hannaford CU Approval, Nos. 129-9-12, 163-11-12, 68-5-14, 69-5-14, 70-5-14, 73-5-14, 113-8-14, 114-8-14 Vtec, slip op. at 10–11 (Vt. Super. Ct. Envtl. Div. Sept. 16, 2015) (Walsh, J.). Here, we reiterate that the proposed parking configuration locates the store's parking in the side or rear yards. There is no parking proposed for the front yard. We therefore conclude that the Project complies with Section 5.6.3 and thus Section 4.3.4(9) of the 2009 Regulations.

Based on the foregoing, we answer Appellants' Question 6 by concluding that the Project complies with Sections 4.3.4(1)–(4) and (6)–(9) of the 2009 Regulations.

d.       1987 Subdivision Approval (Question 7)

In Appellants' Question 7 and Parts 1 and 2 of their Motion for Entry of Judgment,[11] they argue that the Project must be denied because Applicant's site plan violates a setback condition of the 1987 Commerce Park subdivision approval and no amendment of the condition has been sought. Specifically, Appellants argue that the 1986 Final Plat Plan for the Commerce Park subdivision depicts buildings that are, according to the scale, set back 75 feet from the canal, and that this depiction creates an enforceable setback condition. In response, Applicant claims that it has not sought subdivision approval from the Town, and, therefore, it is beyond this Court's jurisdiction to consider the issue of whether a subdivision permit amendment is

---

[10] Section 5.6.4 addresses exterior lighting and requires that lighting be installed to prevent off site glare. Applicant's proposed lighting plan uses reasonable measures to reduce and eliminate light pollution. Section 5.6.5 dictates that projects should incorporate landscaping to screen incompatible structures or large expanses of pavement, to give the lot some privacy, and the help control stormwater and erosion. Applicant's landscaping plans provide all these functions.

[11] Part 1 the Motion for Entry of Judgment argues that because Applicant did not seek an amendment of the 1987 Commerce Park subdivision approval, this Court lacks jurisdiction to consider amending the 1987 subdivision and Applicant cannot collaterally attack the final and binding prior approval. Part 2 of Appellants' Motion argues that there is no evidence before the Court upon which we could find that Applicant's site plan conforms with the 1987 subdivision approval.

needed. Applicant also argues, that even if we do consider the merits of Appellants' claim the building setbacks depicted on the plat plan accompanying the 1987 subdivision approval are unclear and have not been enforced for subsequent development, and thus do not establish enforceable conditions under the Vermont Supreme Court's decision In re Willowell Found. Conditional Use Certificate of Occupancy, 2016 VT 12, ¶ 15.[12]

With regard to Applicant's jurisdictional argument, the parties agree that there has been no request to amend any setback conditions of the 1987 Commerce Park subdivision approval.[13] Therefore, as Appellants argue in their motion, we are without jurisdiction to consider whether the 1987 subdivision approval should be amended under In re Hildebrand, 2007 VT 5, 181 Vt. 568. Nevertheless, even where a project does not seek a subdivision amendment, conditions of a prior subdivision approval can impose land use restrictions. See In re Minor Subdivision Plot Approval No. 88-340 for Stanley Robinson, 156 Vt. 199, 202 (1991); In re Willowell Found. Conditional Use Certificate of Occupancy, 2016 VT 12, ¶ 15. For a condition of a subdivision approval to be enforceable as a land use restriction, however, it must be explicit and provide "sufficient clarity" necessary to notify landowners of the restriction. Willowell, 2016 VT 12, ¶ 17 (quoting In re Farrell & Desautels, Inc., 135 Vt. 614, 617 (1978)). In other words, we will not enforce implied permit conditions that do not provide notice of the applicable regulatory standards. See id. ¶ 17. Moreover, any condition must be read in light of the frequently cited principle that "zoning ordinances must be construed narrowly in favor of the landowner to minimize their hindrance on property rights." Id. ¶ 18.

Therefore, we must consider whether the 1986 Final Plat establishes an enforceable land use restriction. On the last page of the Planning Commission's 1987 approval there is a notation that there was a revision to the approval in 1988. Post-trial, Applicant offered two

---

[12] Appellants argue Applicant waived any argument about the enforceability of conditions from the 1987 subdivision approval because it did not raise the issue in its Statement of Questions. We see no merit to Appellants' waiver argument. The parties' statements of questions define our scope of review. V.R.E.C.P. 5(f). If one party raises an issue in its statement of questions, that issue is properly before us. An opposing party need not respond to the issue in its statement of questions in order to preserve rebuttal argument. See Schuyler NOV, No. 29-2-12 Vtec, slip op. at 3 (Vt. Super. Ct. Envtl. Div. May 30, 2012) (Walsh, J.) (citing In re Garen, 174 Vt. 151, 156 (2002)). Here, Appellants raise the issue of the need for a subdivision permit amendment in their Statement of Questions and Applicant has properly responded with an argument why a permit amendment is not needed.

[13] We do note that Applicant does seek an amendment to the 1987 Commerce Park subdivision in order to increase the size of Lot 15 in the Hannaford Subdivision Appeal, No. 68-5-14 Vtec. Therefore, Applicant's assertion that there is no application to amend the 1987 subdivision permit currently before us is not entirely correct. The specific issue of setbacks, however, was not raised, and there has been no application to amend any setback provisions of the 1987 subdivision approval.

documents, purportedly certificates of compliance for two lots within the Commerce Park subdivision, it claims demonstrate that the 1987 Commerce Park subdivision approval contains no enforceable 75-foot setback condition. Applicant asks this Court to take judicial notice of these documents, claiming judicial notice is proper because the documents can be found in the Town of Hinesburg land records. We are unaware of any authority in Vermont that permits a court to take judicial notice of municipal certificates of compliance, and we refuse to do so here. See V.R.E. 201; Hebert v. Stanley, 124 Vt. 205, 207 (1964) ("[A] court cannot take judicial notice of a local ordinance."). What is more, Applicant has provided no satisfactory reason why the documents were not offered at trial. Applicant was certainly on notice of the issue, but failed to adequately prepare the belatedly offered evidence.[14] We therefore deny Applicant's request. As a result, we have no evidence of the details of any revisions.

We do, however, agree that the 1986 Final Plat Plan does not, in itself, create an enforceable setback condition. In 1987, the Town of Hinesburg Planning Commission granted final plat approval to the Commerce Park subdivision as depicted on the 1986 Final Plat Plan (1986 Plat) that accompanied the subdivision application. See Appellants' Exs. Courtney B and C. The Planning Commission's 1987 written decision approving the subdivision does not discuss or establish any required setbacks for lots within the subdivision. See Appellants' Ex. Courtney B. Through various black lines, the 1986 Plat depicts building setbacks, boundaries, and the location of streams and roads. There are no inscriptions or notes identifying any measured distances between lines on the 1986 Plat. There is, however, a notation that 1 inch is equal to 100 feet. From the various lines depicted on the 1986 Plat, Appellants (presumably through measuring and extrapolating to scale) deduce that any building on Lot 15 must maintain a 75-foot setback from the canal. But there is no accompanying document to the 1986 Plat describing any required setback, there is no writing that would indicate an intent to impose a setback restriction, and the written subdivision approval is devoid of any discussion of setbacks from streams or waterways. The only language about setbacks or building envelopes is in the legend of the 1986 Plat, which indicates the type of boundary depicted by various lines on the Plat. We conclude, therefore, that the distances between various lines on the 1986 Plat are not "sufficiently clear to constitute land use restrictions." Willowell, 2016 VT 12, ¶ 15. In other words, the 1986 Plat does not create an enforceable restriction that the building on Lot 15 must

_____

[14] Applicant made clear that it is not requesting that we reopen the evidence.

maintain a 75-foot setback from the canal.  We therefore answer Appellants' Question 7 and also deny Parts 1 and 2 of Appellants' Motion for Entry of Judgment by concluding that the 1987 Commerce Park subdivision approval does not impose enforceable setback conditions.

## Conclusion

For the reasons provided above, we conclude:  Applicant's permitting procedure was proper; the Project accommodates the mapped community facility; the Project complies with all applicable site plan standards in the 2009 Regulations; and the Project as proposed does not violate any enforceable conditions of the 1987 Commerce Park subdivision approval.  We therefore **AFFIRM** the DRB's decision and impose its conditions of approval, except as modified by our decision and except as modified by changes to the site plans during the pendency of this appeal.

A Judgment Order accompanies this Merits Decision. This concludes the matter before the Court.

Electronically signed on April 12, 2016 at 10:42 AM pursuant to V.R.E.F. 7(d).

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division